1  GREGORY A. BROWER
   United States Attorney
2  BRUCE OHR
   Chief, Organized Crime &
3    Racketeering Section
   1301 New York Avenue, NW, Suite 700
4  Washington, D.C. 20005
   Telephone: 202-353-9366
5  Facsimile: 202-514-3601
   ERIC JOHNSON
6  KRISTA TONGRING
   RONALD CHENG
7  Attorneys for the Government

8              **UNITED STATES DISTRICT COURT**

9                **DISTRICT OF NEVADA**

10                    **-oOo-**

11  UNITED STATES OF AMERICA,  )      CR-S-02-0674-PMP(LRL)
                               )
12       Plaintiff,            )
                               )
13       v.                    )      **UNITED STATES' SENTENCING
                               )      MEMORANDUM FOR DEFENDANT XU
                               )      CHAOFAN; MEMORANDUM OF POINTS
14  XU Chaofan, also known as  )      AND AUTHORITIES; EXHIBIT**
         HUI Yat Fai, *et al.*,   )
15                             )
         Defendant.            )      Date:  May 4, 2009
16  _____)      Time: 9:00 a.m.

17

18       Comes now, the United States, by and through its undersigned counsel, and respectfully

19  submits this sentencing memorandum in preparation for sentencing scheduled for May 4, 2009.

20  The United States concurs with the findings and recommendations of the United States Probation

21  Office in its Presentence Report (PSR) submitted on October 17, 2008 for defendant XU Chaofan,

22  subject to the corrections below in Sections A and I.[1]

23  //

24  //

25

26  _____

27       [1]      Because separate reports have been generated for each defendant, the government
   has submitted separate sentencing memoranda by defendant.  While much of the discussion is
28  the same for all defendants, each memorandum has a separate discussion for each defendant at
   sections A, F, and G.

The United States submits that the sentence recommended therein is justified and appropriate based upon the conduct of these defendants, as discussed in more detail below.

DATED:          March 16, 2009              Respectfully Submitted,

                                            GREGORY A. BROWER
                                            United States Attorney

                                            ERIC JOHNSON
                                            Assistant United States Attorney


                                            _____/s/_____
                                            KRISTA TONGRING
                                            Trial Attorney

                                            RONALD CHENG
                                            Special Trial Attorney

ii

## TABLE OF CONTENTS

DESCRIPTION                                                                 PAGE

A.    Factual Corrections to Pre-Sentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

B.    Introductory Description of Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

C.    Specific Conduct of Defendants XU Chaofan and XU Guojun . . . . . . . . . . . . . . . . . . .  5

      1.    Scheme Against the Bank of China . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

      2.    XU Chaofan's False Identity and Falsely Procured Visas . . . . . . . . . . . . . . . . . .  8

      3.    XU Chaofan's False Marriage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

      4.    XU Guojun's False Identity and Falsely Procured Visas . . . . . . . . . . . . . . . . . .  10

D.    Specific Conduct of KUANG Wan Fang . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

      1.    KUANG's Marriage to XU Chaofan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

      2.    KUANG's False Marriage to Wai Kwong HO . . . . . . . . . . . . . . . . . . . . . . . . . .  12

      3.    KUANG's Travel to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

      4.    KUANG's Residency in Hong Kong and Travel to Other Areas . . . . . . . . . . . .  13

      5.    KUANG's Travel to New York and Divorce from HO . . . . . . . . . . . . . . . . . . . .  14

      6.    KUANG's Knowledge of XU Chaofan's False Name . . . . . . . . . . . . . . . . . . . . .  14

      7.    KUANG's Travel to Las Vegas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

      8.    Purchase of Canadian Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

      9.    Preparations for Flight and Flight in October 2001 . . . . . . . . . . . . . . . . . . . . . .  15

E.    Specific Conduct of YU Ying Yi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

      1.    YU Ying Yi's Marriage to XU Guojun . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

      2.    YU Ying Yi's False Marriage to Steve CHENG . . . . . . . . . . . . . . . . . . . . . . . . .  17

      3.    YU Ying Yi's Travel to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      4.    YU Ying Yi's Residency in Hong Kong and Travel to Other Areas . . . . . . . . .  18

      5.    YU Ying Yi's Divorce from Steve CHENG . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      6.    YU Ying Yi's Travel to Las Vegas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      7.    Purchase of Canadian Homes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

      8.    Preparation for Flight in October 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

TABLE OF CONTENTS (Continued)

DESCRIPTION                                                                   PAGE

F.      Guideline Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

G.      Guideline Sentence/Guideline Section 5G1.2(d)  (PSR ¶¶ 104-106) . . . . . . . . . . . . . . .   23

H.      Reasonableness Analysis under 18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

I.      Restitution (PSR ¶ 115) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

J.      Objections to the Presentence Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

K.      Expert Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

L.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

EXHIBIT 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

The government submits its position regarding the findings and recommendations of the United States Probation Office in its Presentence Report (PSR) as follows:

A.   <u>Factual Corrections to Pre-Sentence Report</u>

The government notes the following factual corrections to the Pre-Sentence Report: No corrections.

B.   <u>Introductory Description of Conduct</u>

This case involved the prosecution of three Chinese nationals, XU Chaofan, XU Guojun and YU Zhendong, who were presidents at the Bank of China, Kaiping Sub-Branch between 1991 and 2001, and their wives, KUANG Wan Fang, YU Ying Yi and YU Xu Hui.  The charges in the Second Superseding Indictment stem from a scheme to defraud the Bank of China (the "Bank") of approximately $482 million orchestrated by the three Bank sub-branch presidents and their subsequent efforts to: (1) launder the stolen money through, among other countries and regions, Hong Kong, Canada, and the United States; and (2) flee China and immigrate to the United States with their wives by obtaining false identities and entering into sham marriages with naturalized United States citizens.  Prior to trial, both YU Zhendong[2] and YU Xu Hui[3] pleaded guilty and agreed to cooperate with the government.  The bank presidents' true wives assisted their husbands in laundering the proceeds of the fraudulent scheme and violated U.S. immigration laws by entering this country illegally and then securing United States citizenship and passports through

---

[2]  On February 28, 2004, YU Zhendong pleaded guilty in the District of Nevada to a one-count criminal Information charging him with participating in a RICO enterprise in violation of 18 U.S.C. § 1962(d), admitting his role in fraud scheme against the Bank.  On April 7, 2004, YU Zhendong was sentenced to twelve years imprisonment.  Pursuant to the terms of the plea agreement and cooperation, YU Zhendong agreed to voluntarily return to China to face trial in that country in exchange for assurances that (1) the maximum prison sentence he would receive from the Chinese government would be twelve years, thereby avoiding the death penalty; and (2) his true (Chinese) wife, YU Xu Hui, would be permitted to remain in the United States with the couple's children if she, too, agreed to plead guilty for her role in this matter.  On April 15, 2004, following the district court's entry of an order of immediate removal, YU Zhendong returned to China where he has been convicted on charges of bribery and embezzlement and is currently serving a twelve-year sentence.

[3]  On April 26, 2005, YU Xu Hui pleaded guilty to a one-count criminal information charging her with unlawfully procuring United States citizenship in violation of 18 U.S.C. § 1425(b).

fraudulent means.

Between 1991 and October 2001, XU Chaofan, XU Guojun, and YU Zhendong, along with other managers and employees of the Bank, stole approximately $482 million from the Bank.  The scheme was initiated by XU Chaofan, then-Vice President of the Kaiping Sub-Branch of the Bank.  In or about 1991, XU Chaofan began using Bank assets to make business investments for his personal enrichment.  XU Chaofan later invited XU Guojun and YU Zhendong, then-managers in the Credit Section of the Kaiping Sub-Branch, to join the scheme. At various points throughout the conspiracy period, one of the three was always in the position of branch president.  The three former branch presidents, assisted by others, transferred the stolen funds to companies and bank accounts in Hong Kong that they and/or other members of the conspiracy owned and/or controlled.  The three did so through a number of different fraudulent schemes, including: (1) authorizing fictitious loans to Chinese factories which, in turn, transferred the proceeds to desired Hong Kong corporations; (2) authorizing legitimate loans to Chinese factories which would repay the loan proceeds to the desired Hong Kong corporations or designated Hong Kong bank accounts; and (3) engaging in significant foreign currency speculation by use of Bank customer information and depositing the commissions into their personal accounts.  XU Chaofan, XU Guojun, and YU Zhendong used their management positions at the Bank to create false records to cover the fraudulent transactions as well as to cause transfers of Bank assets without the proper documentation and approvals.

The true (Chinese) wives of the three former Bank managers (i.e., KUANG Wan Fang, YU Ying Yi, and YU Xu Hui), and the brother of KUANG Wan Fang (i.e., KWONG Wa Po),[4] assisted their husbands and brother-in-law and others in transferring and laundering stolen Bank funds from Hong Kong to the United States, Canada, and elsewhere.  Stolen funds from the Bank were transferred to numerous bank accounts in Hong Kong.  Proceeds of the fraud were used in Hong Kong: (1) to continue the fraudulent scheme (i.e., lulling transactions); (2) to seed

---

[4]  At the time of trial, KWONG Wa Po was still a fugitive.  On October 3, 2008, this Court granted the United States' request to dismiss the charges against KWONG without prejudice.  See Doc. No. 691.

2

investments in real estate; and (3) for the personal use of the individuals involved in the alleged RICO enterprise (e.g., purchase of homes and to fund vacations and gambling trips to Macau, Australia, Las Vegas, and elsewhere).

Beginning in 1999, and continuing through at least October 2001, funds transfers were made from Hong Kong into various bank and casino accounts in the United States either by or under direction of XU Chaofan, XU Guojun, and/or YU Zhendong.  These United States accounts were held by the three former branch presidents, their true (Chinese) wives, and/or their relatives and associates.  The fraud proceeds were then mainly used by the defendants to gamble in Las Vegas and to open investment accounts in domestic financial institutions.

By 2000, XU Chaofan, XU Guojun, and YU Zhendong (using assumed names) and KUANG Wan Fang, YU Ying Yi, and YU Xu Hui had opened bank and brokerage accounts in the United States.  Evidence establishes some significant financial transactions at banks and casinos dating back as early as 1998.  All of the defendants were high-profile gamblers, known to many Las Vegas casinos.  They maintained a lavish life style in Las Vegas in that they stayed at the best hotels, had use of casino jets, and hotel bills evidence that they enjoyed $4,000 meals.  Considered "high rollers," defendants conducted daily transactions at the Las Vegas casinos, in hundreds of thousands of dollars.  In less than two years, defendants lost over $12 million gambling in Las Vegas.

The scheme to defraud the Bank was facilitated by the lack of a central networking system.  Prior to 1997, the Bank did not have a central, consolidated, automated system to cross-check accounting between branches and Sub-Branches.  Instead, the Bank relied on individual branches and employees to accurately report transactions.  Consequently, XU Chaofan, XU Guojun, YU Zhendong, and their associates were able to approve loans and other transfers of Bank assets on their signature alone, and to use the official seal of the Bank to authorize fraudulent transfers.  The three Bank managers and their associates were able to cover up their fraudulent activities by directing lower-level Bank employees to create paperwork for non-existent loans, or otherwise make inter-account transfers appear legitimate.  XU Chaofan, XU Guojun, and YU Zhendong also used at least one compliant manager at a state-owned corporation

3

in China to disguise the fraudulent transfers.

Forewarned of impending audits occurring between 1995 and 2000, XU Chaofan, XU Guojun, and YU Zhendong were able to create fraudulent records to satisfy the auditors.  In October 2001, however, the Bank discovered during a financial audit that a significant amount of Bank funds were missing and traced the deficiency to the Kaiping Sub-Branch. This audit occurred immediately after the bank instituted a central bank networking system that it previously lacked.  An on-site audit of the Kaiping Sub-Branch revealed at least $400 million had been stolen.

Prior to the discovery of the theft, the former Bank managers and their true (Chinese) wives participated in a second (related) fraudulent scheme in an effort to evade capture if and when the Bank funds were found to be missing.  This scheme included, among other United States crimes, marriage fraud, passport fraud, and visa fraud.  The three married couples traveled extensively during the 1990s, primarily to Hong Kong, the United States, Canada, Australia, and Macau.  They lost huge amounts of money gambling, trading foreign currencies, and engaging in other failed investments.   During this time, they also took steps to prepare for an inevitable day of discovery, planning to flee China and immigrate to the United States if the fraudulent scheme perpetrated against the Bank became known.

In 1994, under the direction of their husbands, KUANG Wan Fang, YU Ying Yi, and YU Xu Hui obtained Chinese marriage certificates purporting to evidence marriages between them and naturalized United States citizens.  No marriages ever took place, however, and the true (Chinese) wives never lived with their fake spouses in the United States.  The true (Chinese) wives then began the process of naturalization in the United States, and eventually became United States citizens based, in large part, on their fraudulent marriages.  Additionally, XU Chaofan, XU Guojun, and YU Zhendong established false identities in China and Hong Kong and then married naturalized United States citizens using their false names.  These marriages took place first in Hong Kong and then in the Los Angeles International Airport.  As with the true (Chinese) wives, none of the former bank managers lived with their fake spouses in the United States.

In October 2001, after being tipped off that the theft of Bank funds had been discovered

XU Chaofan, XU Guojun, and YU Zhendong fled China.  The three former Bank managers initially went to Hong Kong where they transferred large amounts of money out of the country; they then fled to Canada and subsequently entered the United States.  The true (Chinese) wives - KUANG Wan Fang, YU Ying Yi and YU Xu Hui - were alerted while they were in the United States.  They immediately traveled back to Hong Kong, packed up their belongings, gathered their children and relatives, and within days traveled to Canada.  Prior to this date, the male defendants had purchased luxury homes in Canada in the names of their true (Chinese) wives.

Once in Canada, the former bank managers illegally entered the United States from Canada with the assistance of a Los Angeles-based immigration attorney, Francis Cowhig, and his assistant, Kary Lee; the managers used their fraudulently obtained visas.  Soon thereafter, KUANG Wan Fang, YU Xu Hui and their children followed, again with the assistance of the attorney and his assistant.  The women used their fraudulently obtained United States passports, while their children who were not United States citizens were provided United States passports in the name of other people to use for the border crossing.

YU Xu Hui and YU Zhendong settled in the Los Angeles area.  The remainder of the defendants, in order to evade law enforcement detection, traveled to Kansas and Oklahoma where they remained  fugitives until their locations were discovered by law enforcement.  On September 22, 2004, XU Guojun and YU Ying Yi were arrested in Wichita, Kansas.  Two weeks later, on October 6, 2004, XU Chaofan and KUANG Wan Fang were arrested in Oklahoma City, Oklahoma.

C.	Specific Conduct of Defendants XU Chaofan and XU Guojun

	1.	Scheme Against the Bank of China

	XU Chaofan began working at the Kaiping Sub-Branch, Bank of China in February 1982. He was appointed as President of the Sub-Branch in May 1992 and remained in that position until August 1998, when he moved to a higher branch of the Bank.  When XU Chaofan transferred to the other branch, YU Zhendong became the president of the Kaiping Sub-Branch and held this position until May 2000 when he transferred to another branch.  At this time, XU Guojun became President of the Kaiping Sub-Branch and remained in that position until the defendants fled from

China.  At all times during the conspiracy, one of the men controlled the Kaiping Sub-Branch.

Evidence at trial established that the scheme to defraud the Bank began in the early 1990s.  As

early as 1991, XU Chaofan began using the Bank's money to speculate in foreign currency.

Between 1993 and 1995, approximately $142 million of the Bank's money was lost in this

speculation.  In order to hide the losses, and in an effort to recoup the money, XU Chaofan, along

with XU Guojun and YU Zhendong, developed several methods to take money from the Bank

and transfer it to companies and bank accounts in Hong Kong.  While YU Zhendong testified that

there was an intent to use the Bank's money in order to make profits, retain the profits for

themselves and to return the stolen funds back to the Bank, the evidence established that at least

$482 million was never returned to the Bank.  Rather the funds were used by all defendants and

their associates for their personal enrichment.  Additionally, YU Zhendong admitted that even if

they had returned the funds to the Bank, they committed a crime by stealing the funds in the first

place.  Throughout the years, the three former Bank managers used their positions to create false

and fictitious documentation and approve transactions that were in violation of Bank rules in

order to deceive other Bank officials into funding fraudulent loans and payments.  XU Chaofan,

XU Guojun, and YU Zhendong also used their positions at the Bank to fraudulently authorize

transfers from the Bank's foreign currency accounts to companies and accounts they and other

members of the conspiracy controlled in Hong Kong.  The three former Bank managers also used

their positions to divert legitimate loan repayments from the Bank to themselves and companies

they and their associates owned and/or controlled.  Testimony from several witnesses established

that XU Chaofan directed not only YU Zhendong and XU Guojun in the criminal activity, but

numerous other bank employees.  On three separate occasions, XU Chaofan, YU Zhendong

and/or XU Guojun either altered or directed the alteration and creation of false documents to

cover up their theft when internal or external banking audits were being conducted.  One of these

occasions, in 1995, involved over 20 sub-branch employees working for several weeks under the

direction of the three men to alter and/or create a significant number of documents to cover up the

losses from and unauthorized transactions of foreign currency exchange.  When the Sub-Branch

successfully passed the audit, there was a celebration dinner and many of the Sub-Branch

employees received cash for their work.

To execute this fraud, XU Chaofan, XU Guojun, and YU Zhendong took advantage of an internal accounting system in the Bank known as the interbranch (also known as inter-bank) system.  This system was a mechanism for transferring funds between branches to allow a particular branch or sub-branch to conduct business.  XU Chaofan, XU Guojun, and YU Zhendong used the interbranch system to conduct their illegal foreign exchange and loan activities and directed sub-branch employees to submit false interbranch reports to the supervising-level branch of the Bank.

In November 1991, XU Chaofan set up a company in Hong Kong called Ever Joint Ltd. ("Ever Joint").  This company became the primary conduit that XU Chaofan, XU Guojun, and YU Zhendong used to transfer money they stole from the Bank out of China.  XU Chaofan hired his cousin, HUI Yat Sing, and HUI Yat Sing's wife, WONG Suet Mui, to run the daily operations of Ever Joint in Hong Kong.  Expert testimony at trial, by a forensic accountant, established that personal bank accounts held by XU Chaofan and XU Guojun in Hong Kong were primarily funded from the Ever Joint account.  Accounts in Hong Kong held by KUANG Wan Fang and YU Ying Yi were indirectly funded by the Ever Joint and/or XU Chaofan and XU Guojun accounts.

As managers of the Kaiping Sub-Branch, XU Chaofan, XU Guojun, and YU Zhendong controlled how domestic companies used the Bank to make payments in foreign currencies.  In defrauding the Bank, the three former Bank managers used a number of Kaiping companies and their foreign exchange accounts.  The two companies that they used most often were Kaiping Polyester Factory ("Kaiping Polyester") and the Kaiping Zhong Hui Filament Company ("Zhong Hui Filament").[5]

Both Kaiping Polyester and Zhong Hui Filament bought equipment and supplies overseas. The normal (legitimate) procedure was for the company to transfer funds to the Bank, together with the relevant purchase order/agreement, invoice, and delivery receipt.  The Bank would remit

---

[5] Kaiping Polyester Factory was re-named Kaiping Polyester Group Enterprise in 1998. These two companies merged in 2002 under the name Polyester Group.

the appropriate amount (in United States or Hong Kong dollars) to the supplier in Hong Kong or elsewhere.  In furtherance of their fraudulent scheme, XU Chaofan, XU Guojun and YU Zhendong directed their employees at the Kaiping Sub-Branch to create false documentation so that it appeared that legitimate purchases, transfers, and payments were being requested by a particular company and, in turn, remitted by the Bank.  In fact, the companies did not transfer any money to the Bank; rather, the Bank funds went directly to accounts in Hong Kong in the name of Ever Joint which were owned and/or controlled by XU Chaofan, XU Guojun and YU Zhendong.

        2.      <u>XU Chaofan's False Identity and Falsely Procured Visas</u>

In July 1997, XU Chaofan obtained a false one-way exit visa in China.  This document was in his alias name - HUI Yat Fai - and contained a false date of birth.  Testimony at trial indicated that bribes were paid by XU Chaofan to obtain this document.  XU Chaofan used this false one-way exit visa in August 1997 to obtain a Hong Kong Document of Identity for Visa Purposes (essentially, a passport issued by Hong Kong authorities).  XU Chaofan then used this document, containing a false name and false date of birth, to obtain U.S. visas, travel in and out of the United States and Canada, and use as identification in Las Vegas casinos.  Specifically, on or about September 20, 2000 and January 29, 2001, XU Chaofan received U.S. visas that were based upon numerous false statements in the visa applications.  XU Chaofan subsequently used these visas as evidence of authorized stays in the United States as set forth in Counts 3 through 6.

First, records from the Bellagio Hotel and Casino in Las Vegas reveal that, on October 4, 2000, XU Chaofan (using his alias) used his fraudulently procured United States non-immigrant visa (issued September 20, 2000) as identification shown to casino officials.  Turning to October 2, 2001, and October 15, 2001, two United States immigration stamps in XU Chaofan's falsely obtained Document of Identity for Visa Purposes (<u>i.e.</u>, bearing his fake name and birth date) document his actual use of the fraudulently procured United States non-immigrant visa (issued January 19, 2001) as well as his entry into Las Vegas on the above-cited dates.  XU Chaofan's presence in Las Vegas on October 2, 2001, and, again, on October 15, 2001, under the alias HUI Yat Fai, is further demonstrated by the facts that (1) from October 2-6, 2001, he lost nearly $4 million gambling at Caesar's Palace Hotel and Casino; and (2) upon his October 15, 2001

8

return, he lost an additional $600,000 gambling at the same casino.  These casino records are in the name HUI Yat Fai.  Records obtained from the Paris Hotel and Casino in Las Vegas further reveal that, on October 5, 2001, an IRS Form 8852, CTR-C, was issued in the name of HUI Yat Fai documenting his $20,000 "cash out" of casino chips.  In processing the CTR-C, a casino official noted that HUI Yat Fai's identity was verified by looking at the "information on file" for the "known patron," and that his casino file contained a copy of his Document of Identity for Visa Purposes (i.e., bearing his false name and birth date).

    3.    <u>XU Chaofan's False Marriage</u>

On March 11, 2001, XU Chaofan, using his false Hong Kong identification for HUI Yat Fai, married Mei Xie PENG in Hong Kong.  Ms. PENG was a former high school classmate of XU Chaofan in Kaiping and had emigrated to Brooklyn, where she became a naturalized U.S. citizen. In May 2001, XU Chaofan, who was in Las Vegas with XU Guojun, directed Ms. PENG to fly from New York to Las Vegas along with her younger sister, Joanne XIE (Ms. XIE had entered into a false marriage with XU Guojun in Hong Kong).  XU Chaofan and XU Guojun, together with Ms. PENG and Ms. XIE, then flew from Las Vegas to Los Angeles.  On May 4, 2001, with the goal of facilitating the obtainment of a green card, Ms. PENG and XU Chaofan filled out California marriage documents in a restaurant at the Los Angeles airport as part of a "remarriage" (as discussed below, XU Guojun and Ms. XIE filled out similar documents for their own "remarriage").  Upon returning to Las Vegas, the four went to a Bank of America branch where each "couple" opened a joint bank account with a nominal deposit supplied with XU Chaofan and XU Guojun, respectively.  While Ms. PENG testified that she had the intent to enter into a real marriage with XU Chaofan, evidence at trial established that in addition to XU Chaofan using a false identity for this marriage, Ms. PENG and XU Chaofan never lived together. Ms. PENG was unaware of XU Chaofan's financial activities in Hong Kong (including Ever Joint) and was unaware of his account holdings there.  In fact, Ms. PENG only saw XU Chaofan a few times after their marriage. XU Chaofan continued to live with KUANG Wan Fang and their children in Hong Kong after he married Ms. PENG.  Additionally, no divorce documents for XU Chaofan and KUANG Wan Fang were ever filed or registered in China.

4.    <u>XU Guojun's False Identity and Falsely Procured Visas</u>

In July 1997, XU Guojun obtained a false one-way exit visa in China.  This document was in his alias name -- HUI Kit Shun -- and contained a false date of birth.  Testimony at trial indicated that bribes were paid by XU Chaofan to obtain this document.  XU Guojun used this false one-way exit visa in August 1997 to obtain a Hong Kong Document of Identity for Visa Purposes.  XU Guojun then used this document, containing a false name and false date of birth, to obtain U.S. visas, travel in and out of the United States and Canada, and use as identification in Las Vegas casinos.  Specifically, on or about September 20, 2000 and January 29, 2001, along with XU Chaofan, XU Guojun received U.S. visas that were based upon numerous false statements in the visa applications.  XU Guojun subsequently used these visas as evidence of authorized stays in the United States as set forth in Counts 7 through 9.

First, records obtained from the Bellagio Hotel and Casino in Las Vegas, Nevada, reveal that, like XU Chaofan, on October 6, 2000, XU Guojun used his fraudulently procured United States non-immigrant visa (issued September 20, 2000) as identification shown to casino officials.  Turning to October 2, 2001, and October 15, 2001, two United States Immigration stamps in XU Guojun's falsified Document of Identity for Visa Purposes (<u>i.e.</u>, bearing his assumed name and birth date) document his actual use of the fraudulently procured United States non-immigrant visa (issued January 19, 2001) as well as his entry into Las Vegas on the above-cited dates.  XU Guojun's presence in Las Vegas on October 2, 2001, and, again, on October 15, 2001, under the assumed name HUI Kit Shun is further demonstrated by the facts that (1) from October 2-6, 2001, he lost $110,000 gambling at Caesar's Palace Hotel and Casino; (2) when he returned on October 15, 2001, he lost an additional $383,000 gambling at the same casino; and (3) on October 15, 2001, he authorized the wire transfer of over $1.5 million from Hong Kong to the Paris Hotel and Casino.  The casino records all bear the name HUI Kit Shun.

5.    <u>XU Guojun's False Marriage</u>

On March 9, 2001, XU Guojun, using his false Hong Kong identification, married Joanne XIE, the sister of Mei Xie PENG, in Hong Kong.  Ms. XIE had also emigrated from Kaiping to Brooklyn and had become a naturalized U.S. citizen.  Ms. XIE lived in a downstairs unit in the

same house in Brooklyn as Ms. PENG and met XU Guojun through a telephone introduction by XU Chaofan and Ms. PENG.  As discussed above, Ms. XIE accompanied Ms. PENG to Las Vegas in May 2001. On May 4, 2001, with the goal of facilitating the obtainment of a green card, along with Ms. PENG and XU Chaofan, XU Guojun and Ms. XIE filled out papers in the Los Angeles airport restaurant as part of the "remarriage."  Upon returning to Las Vegas, the four went to a Bank of America branch where each "couple" opened a joint bank account with a nominal deposit supplied with XU Chaofan and XU Guojun, respectively.  While Ms. XIE testified that she also had the intent to enter into a real marriage with XU Guojun, evidence at trial established that in addition to XU Guojun using a false identity for this marriage, Ms. XIE and XU Guojun never lived together.  Ms. XIE was unaware of XU Guojun's financial activities in Hong Kong (including Ever Joint) and was unaware of his account holdings there.  Throughout their "marriage," Ms. XIE addressed XU Guojun as "Manager XU."  In fact, Ms. XIE only saw XU Guojun one other time after their Hong Kong marriage and that was in Las Vegas when they flew to Los Angeles for the "remarriage."  XU Guojun continued to live with YU Ying Yi and their children in Hong Kong after he married Ms. XIE and evidence at trial, detailed below, established that YU Ying Yi and XU Guojun never divorced.  After XU Guojun was arrested, Ms. XIE obtained a default divorce from XU Guojun.

D.    Specific Conduct of KUANG Wan Fang

        1.    KUANG's Marriage to XU Chaofan

        KUANG Wan Fang was married to XU Chaofan on July 7, 1992.  This marriage was registered in the civil affairs office in the Sanbu district in Kaiping.  Testimony from several witnesses at trial established that typically, the couple goes to the office to register the marriage, where each member of the couple receives a marriage certificate.  An index in the office shows the marriage between XU Chaofan and KUANG Wan Fang was duly registered.  YU Zhendong testified that he attended the wedding of the couple.  Additionally, a wedding photograph of KUANG and XU Chaofan was found in their house during the post-arrest search.  As discussed below, the actual marriage documents were later improperly removed from the office.  There were no documents found, real or fraudulent, suggesting the two had ever divorced.

11

2.     KUANG's False Marriage to Wai Kwong HO

In 1994, which was the same year that XU Chaofan received a reprimand in the Sub-Branch for engaging in unauthorized foreign-exchange transactions, XU Chaofan, together with XU Guojun and YU Zhendong, planned to have their spouses engage in false marriages with naturalized U.S. citizens who had emigrated from China or Hong Kong.  For KUANG Wan Fang, the U.S. citizen who was found was Wai Kwong HO, who had emigrated from Hong Kong in the early 1980s and in 1994 was living in the New York City area.  A friend of a relative, named "Mr. Wong," solicited HO's interest in entering into a false marriage with a woman from China and told HO that HO would not have to assume any financial obligation, because the woman was "rich" and her husband was the "number one" in his bank.

HO agreed to enter into this arrangement and, in October 1994, he traveled to Hong Kong and then traveled to Kaiping with Mr. Wong.  In Kaiping, KUANG Wan Fang met HO at his hotel, and the two drove to a photographic studio to take pictures together.  There was no marriage ceremony or banquet, and the two did not go to the civil affairs office for any kind of marriage registration.  After three or four days in Kaiping, HO returned to Hong Kong and then to New York.  YU Zhendong, under the direction of XU Chaofan, prepared a fictitious Chinese marriage certificate for HO and KUANG bearing the date of October 11, 1994.

In New York, Mr. Wong instructed HO to sign papers petitioning for KUANG Wan Fang to emigrate to the United States as HO's alien spouse.  The papers included the false Chinese marriage certificate (prepared by YU Zhendong) dated October 11, 1994, that HO never saw when he was in China.  In connection with this petition and subsequent immigration applications, Mr. Wong had HO sign and provide false documents stating that he and KUANG lived together in an apartment in Elmhurst, stating that KUANG was an account holder on HO's accounts, and stating that KUANG was HO's spouse on HO's tax returns.  In fact, HO never lived at the Elmhurst address, never shared his accounts with KUANG, never lived with KUANG, and never had any social, sexual, or other relations with KUANG.

The Immigration and Naturalization Service ("INS") approved the petition for alien relative, and KUANG Wan Fang entered the United States in 1995.  Eventually, KUANG

petitioned for naturalization, and she was naturalized on June 22, 2000.  Upon being naturalized, KUANG applied for a passport; the passport application falsely stated that she was married to Wai Kwong HO.  She subsequently used that passport as set forth in Counts 10 through 12.

3.    KUANG's Travel to the United States

After obtaining initial approval to enter the United States, KUANG entered the United States in October 1995 through New York.  From this time period onward, KUANG Wan Fang spent most of her time when she was in the United States in San Francisco, together with Fion YU in an apartment that a former Kaiping sub-branch employee, DING Hao, rented across the street from DING's residence (as further described in the discussion of YU Ying Yi, XU Chaofan tasked DING Hao with finding U.S. citizens to enter into false marriages with YU Ying Yi and Fion Xu Hui YU).  Eventually YU Ying Yi came to San Francisco and lived in the apartment upstairs from DING.  XU Chaofan, XU Guojun, and YU Zhendong visited the wives on at least one occasion while they were staying in San Francisco.

KUANG did not stay continuously in the United States, but rather, as her immigration and other travel documents demonstrated, traveled frequently to Hong Kong, mainland China, and other countries and regions in Asia.  On the trips back to China from the United States, KUANG often traveled together with Fion YU.  During her stays in San Francisco, KUANG gave birth in 1996 and 1999 to the second and third children she had with XU Chaofan.  The birth certificates falsely stated that HO was the father.

4.    KUANG's Residency in Hong Kong and Travel to Other Areas

During this time period, KUANG and XU Chaofan lived in luxury apartments in Hong Kong, culminating in their move to a luxury top-floor apartment in the Le Sommet complex in North Point purchased for over two million U.S. dollars.  KUANG Wan Fang maintained banking and trading accounts in Hong Kong.  From February 1, 1997, to October 31, 2001, KUANG had HKD 17,305,728 transferred into her accounts and HKD 14,557,169 transferred out of those accounts.  HKD 2,615,000 came from her brother, KWONG Wa Po, who in turn received over 40% of the transfers into his accounts from XU Chaofan or Ever Joint and related entities.  The transfers also indicate significant gambling activity, including transfers into her accounts of HKD

5,500,000 from casinos.  Evidence at trial established that all gambling activity by the defendants was funded out of the Ever Joint accounts.  Based on immigration applications (including an INS permit to reenter) and a passport she obtained after being naturalized on June 22, 2000, KUANG traveled to Macau and Australia.  Based on transfers from Ever Joint to casinos in these regions and the transfers in and out of her Hong Kong accounts, KUANG traveled to these areas primarily on gambling vacations.

        5.      KUANG's Travel to New York and Divorce from HO

KUANG traveled on several occasions to New York.  On one trip, KUANG briefly met HO, who had been instructed to pick up KUANG at an address in Brooklyn, which is believed to be the home of Mei Xie PENG (as discussed above, the false spouse of XU Chaofan).  The two then drove to Battery Park in Manhattan to take pictures together for immigration purposes and then returned to PENG's house, where KUANG left and from where HO returned to his residence alone.  HO met KUANG on one other occasion when KUANG paid him approximately USD $10,000 for completing paperwork claiming that KUANG's second and third child with XU Chaofan were his.  On August 25, 2000, HO was instructed to meet KUANG at an attorney's office in New York, where the two signed divorce papers and HO was again provided cash from KUANG.  Bank records which were admitted at trial established that on this day, KUANG had withdrawn $15,000 cash from her bank account in Brooklyn.   For entering into the false marriage, HO received a total of $55,000, including a wire transfer from Ever Joint.

        6.      KUANG's Knowledge of XU Chaofan's False Name

KUANG was aware of XU Chaofan's use of the false name "HUI Yat Fai."  In November 2000, KUANG submitted an application to register a marriage in Hong Kong between her and "HUI Yat Fai."  The application included a photocopy of a Hong Kong identification card for HUI Yat Fai that bore XU Chaofan's picture.  KUANG had become a U.S. citizen at this point.  Therefore, it appears that this was an attempt to obtain status in the U.S. for XU Chaofan under his false name.  Ultimately, KUANG asked the Hong Kong marriage office to withdraw the application.  Soon thereafter, on March 11, 2001, XU Chaofan, as "HUI Yat Fai," registered the marriage with Mei Xie PENG.

7.      KUANG's Travel to Las Vegas

KUANG traveled to Las Vegas to gamble from as early as 1998 to October 2001.  During many of the trips, KUANG traveled with XU Chaofan, XU Guojun, YU Zhendong, YU Ying Yi, and YU Xu Hui.  During these trips, KUANG played together with the others at baccarat and her average bets ranged from $3,000 to $10,000.

8.      Purchase of Canadian Home

XU Chaofan, XU Guojun, and YU Zhendong also arranged for homes to be purchased in Canada in the names of their spouses.  In September/October 2001, a home in Richmond, Canada was purchased in the name of KUANG Wan Fang for approximately $800,000 Canadian dollars.

9.      Preparations for Flight and Flight in October 2001

In the fall of 2001, HUANG Weiliang, an officer at the Kaiping Sub-Branch asked CHEN Huishi, a clerk at the civil affairs office in the Sanbu district of Kaiping who was responsible for marriage documents, for documents of XU Chaofan and KUANG Wan Fang.  CHEN complied, and HUANG removed those documents without ever returning them.  A short time later, an official in another government office, ZHANG Lizhen, visited CHEN and asked him to retrieve documents for XU Chaofan and XU Guojun who she claimed were leaving the country.  ZHANG testified in deposition that she was asked to make this request by KUANG's mother, WU Aiqiong.  CHEN then took documents for XU Guojun and concealed them in the office.  In addition, CHEN obliterated the entries for XU Chaofan and XU Guojun on the relevant pages of the registration catalogue index.  Later, CHEN decided to recopy the page containing the XU Guojun entry.[6]

In October 2001, when XU Chaofan, XU Guojun, and YU Zhendong discovered that an investigation was about to occur at the Kaiping sub-branch, they arranged for themselves and their wives to flee to Canada.  YU Xu Hui and Shanna MA traveled to Hong Kong to get YU Xu Hui's children who had remained in Hong Kong.  The group then met KUANG Wan Fang, YU

---

[6]  The recopied page contained an error in the designation of Kaiping as a city, rather than a county, which was the improper status for the locality at the time of the XU Guojun and YU Ying Yi marriage in 1985.  When this error was noted in depositions conducted in 2005, CHEN recovered the page and wrote the Chinese character for "city" over the word "county." CHEN admitted this alteration during trial.

Ying Yi, and their children, and all of them traveled from Hong Kong to the homes in Richmond, Canada. Bank documents established that KUANG transferred money from her Hong Kong accounts to accounts that she held in Canada prior to fleeing Hong Kong. Once KUANG was in Canada, bank records establish numerous multiple daily ATM withdrawals of cash out of her bank accounts in the U.S. YU Xu Hui testified at the trial that there were discussions about accounts being frozen. The group waited in Richmond until the arrival of Kary Lee, the paralegal of Francis Cowhig, who had arranged for the false marriage ceremony in May 2001 between Shanna Yu MA and YU Zhendong, as well as the double-marriage a day later between XU Chaofan and Mei Xie PENG, on the one hand, and XU Guojun and Joanne XIE, on the other. Because KUANG Wan Fang's oldest daughter and YU Xu Hui's twins did not have United States citizenship, Lee arranged to obtain United States travel documents for those children. KUANG Wan Fang, YU Xu Hui, their five children, and Kary Lee drove across the U.S.-Canada border to Seattle, where they flew to Los Angeles near the end of 2001, and then stayed in the Pasadena area of Los Angeles.

Eventually KUANG Wan Fang and XU Chaofan moved to Wichita, Kansas, and then to Edmond, Oklahoma. KUANG and Xu Chaofan were arrested on October 6, 2004 in front of a residence they had been renting at 16421 Bandera in Edmond, Oklahoma. In the house, agents found cash totaling over $100,000, which was secreted in various parts of the house, and jewelry with a value of approximately $70,000. While waiting in a police car after arrest, KUANG spoke with a friend and instructed her to remove USD $10,000 from the house. The friend was unable to do so.

E.   Specific Conduct of YU Ying Yi

    1.   YU Ying Yi's Marriage to XU Guojun

YU Ying Yi was married to XU Guojun on April 30, 1985. This marriage was also registered in the civil affairs office in the Sanbu district in Kaiping. An index in the office shows this marriage was duly registered. DING Hao, the former bank employee, attended a reception at XU Guojun's home around that time to celebrate the marriage.

2.    YU Ying Yi's False Marriage to Steve CHENG

In 1994, YU Ying Yi took part in the plan of XU Chaofan, XU Guojun, and YU Zhendong to have their spouses engage in false marriages with naturalized U.S. citizens.  XU Chaofan contacted DING Hao, who had since emigrated to San Francisco, and asked DING to find a U.S. citizen who was willing to participate in a marriage.  DING approached Steve CHENG, who was originally born in China, emigrated to the United States in the 1970s, and became a naturalized U.S. citizen in the early 1980s.  CHENG accepted.[7]  In October 1994, CHENG traveled to Hong Kong, where he called a telephone number provided to him by DING. The person who answered met CHENG and arranged for CHENG's lodging in Hong Kong. While CHENG was in Hong Kong, CHENG met YU Ying Yi, who brought XU Guojun and their son (at that time, YU Ying Yi had a son, XU Li Cong, with XU Guojun).  The next day, CHENG traveled alone on the ferry from Hong Kong to Kaiping.  In Kaiping, a man met CHENG and took CHENG to a hotel.

While in Kaiping, YU Ying Yi again met CHENG, and the two went in a group of about ten people to a park to take pictures.  (YU Xu Hui also testified that she and her false husband were in the park that day with YU Ying Yi and CHENG).  The two then went to a photographic studio.  As in the case of KUANG Wan Fang's false marriage to Wai Kwong HO, YU Ying Yi and Steve CHENG did not have any sort of marriage ceremony or banquet, and they did not go to the civil affairs office for any kind of marriage registration.  YU Zhendong, again under the direction of XU Chaofan, created a false marriage certification for YU Ying Yi and CHENG. After several days in Kaiping, CHENG traveled alone to Guangzhou, Shenzhen, and then back to Hong Kong.  Upon his return to Hong Kong, CHENG called the telephone number that DING had provided him, and a women met him and gave him several thousand U.S. dollars in cash.

Upon return to the United States, CHENG was asked to sign immigration documents for the benefit of YU Ying Yi and her son, XU Li Cong, including a petition for alien relative so that

---

[7]After DING told Xu Chaofan that CHENG had accepted, XU Chaofan asked DING to find another U.S. citizen for another woman.  Through CHENG, DING found Tai Wah WONG, who flew to China to participate in a false marriage with YU Xu Hui, YU Zhendong's wife.

YU Ying Yi could enter the United States.  The petition falsely stated an address on 31st Street in San Francisco for CHENG that in fact was DING Hao's address.  The documents included a copy of a Chinese marriage license dated October 10, 1994 (made by YU Zhendong), which CHENG had never seen when he was in China.

The INS approved the petition for alien relative, and YU Ying Yi entered the United States in mid-1995.  Eventually, YU Ying Yi petitioned for naturalization, and she was naturalized on November 11, 1999.  Afterwards, YU Ying Yi applied for a passport.  The application falsely stated that she was married to Steve CHENG.  YU Ying Yi subsequently used that passport as set forth in Counts 13 through 15.

> 3.    YU Ying Yi's Travel to the United States

Once the immigration applications were approved, DING directed CHENG to go to Hong Kong and escort YU Ying Yi and XU Li Cong back to San Francisco.  CHENG complied.  In San Francisco, YU Ying Yi did not live with CHENG but instead stayed at the upstairs unit in the house where DING Hao lived.  YU Ying Yi lived in this unit with XU Guojun's mother and father.  CHENG met several times with YU Ying Yi in San Francisco, including one time when they opened a joint bank accounts for which YU Ying Yi provided the opening deposit and that Steve CHENG never used, and traveled with her on one trip to Las Vegas with a group of others.  CHENG never had any social, sexual, or other relations with YU Ying Yi and, in fact, addressed YU Ying Yi as "Ms. YU" or "Ms. XU."

YU Ying Yi did not stay continuously in the United States, but rather, as her immigration and other travel documents demonstrated, traveled frequently to Hong Kong, mainland China, and other countries and regions in Asia.  During her stays in San Francisco, YU gave birth in 1997 to Benson XU, the second son she had with XU Guojun.  The birth certificate falsely stated that CHENG was the father.

> 4.    YU Ying Yi's Residency in Hong Kong and Travel to Other Areas

Like KUANG, YU Ying Yi during this time period lived in luxury apartments in Hong Kong, including the luxury apartment in the Le Sommet complex, where YU Ying Yi and XU Guojun lived on the third floor immediately below the topmost floor, where XU Chaofan and

KUANG Wan Fang lived (YU Zhendong and YU Xu Hui lived on the second floor down from the topmost floor).  Like KUANG, YU Ying Yi maintained banking and trading accounts in Hong Kong.  From January 1, 1998, to January 31, 2002, YU Ying Yi had HKD 32,512,815 transferred into her accounts and HKD 32,311,046 transferred out of those accounts.  HKD 2,707,517 of the incoming transfers came from XU Guojun, and HKD 2,925,000 of the incoming transfers came from KWONG Wa Po, KUANG Wan Fang's brother.  The transfers include significant investment trading, including HKD 21,099,253 of transfers out of the accounts, which was well in excess of the HKD 17,571,241 that went into the accounts.

### 5.   YU Ying Yi's Divorce from Steve CHENG

In 2000, YU Ying Yi divorced Steve CHENG.  YU Ying Yi told CHENG to come to an office in San Francisco to sign divorce papers.  When CHENG went to the office to sign, YU Ying Yi was not there.  Although the documents provided for child support, CHENG never paid any child support to YU Ying Yi.

### 6.   YU Ying Yi's Travel to Las Vegas

YU Ying Yi traveled to Las Vegas to gamble from 1998 to October 2001.  During the many trips, YU Ying Yi traveled with XU Chaofan, XU Guojun, YU Zhendong, KUANG Wan Fang, and YU Xu Hui.  During these trips, YU Ying Yi played together with the others at baccarat, and her average bet ranged from USD $2,000 to $10,000.

### 7.   Purchase of Canadian Homes

YU Ying Yi also took part in the scheme of XU Chaofan, XU Guojun, and YU Zhendong to purchase homes in Canada in their spouses' names.  At the same time that the house in KUANG's name was purchased, another one was also purchased in YU Ying Yi's name for approximately $800,000 Canadian dollars.

### 8.   Preparation for Flight in October 2001

As described above, a Kaiping sub-branch bank official and a local government official who had been contacted by KUANG's mother asked the local clerk in the marriage registration office to conceal certain marriage documents for XU Chaofan and KUANG Wan Fang, on the one hand, and XU Guojun and YU Ying Yi on the other.  Additionally, a false divorce certificate was

found by the Chinese police in a miscellaneous storage room in the marriage registry office.  YU Zhendong testified that a similar type of certificate was shown to him by HUANG Weiliang.

In October 2001, YU Ying Yi took part in the flight from Hong Kong to Canada, and then the United States.  YU Ying Yi traveled with her children from Canada into the United States, and YU Ying Yi, along with her husband XU Guojun, XU Chaofan, and KUANG Wan Fang, moved to Wichita, Kansas.  XU Guojun and YU Ying Yi resided in Wichita, Kansas until their arrest on September 22, 2004.

On the date of the arrest, agents searched the residence.  In addition to cash and jewelry, the agents found identical Chinese-language divorce mediation documents, but with different dates of 1994 and 1996.

F.    Guideline Calculations

The government concurs with the Probation Office's offense level computations and in particular notes the following:

1a.    Base Offense Level/Guideline Section 2B1.1(b)(9) (PSR ¶ 63).  The Probation Office has noted that a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(9)(A), due to relocation of a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials.  The government concurs with this enhancement, but also notes that the same enhancement is alternatively supported under subsection (B) for commission of a substantial part of the fraudulent scheme from outside the United States and (C) involvement of sophisticated means.  With regard to the "sophisticated means" basis, not only did the scheme involve manipulation of the Bank of China's internal bank accounts, including the interbranch accounts, but it also involved repeated alteration of bank records.  In Hong Kong, the Ever Joint conduit company and the various bank and investment accounts of Ever Joint and its related entities, as well as for the individual defendants, were used to execute and conceal the scheme.  As the commentary to Section 2B1.1(b)(9) makes clear, "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  Here, the use of the various entities in Hong Kong, including Ever Joint, for which the vast majority of transactions lacked economic substance,

satisfy this definition.

1b.   Base Offense Level/Guideline Section 2B1.1.(b)(13)(A) (PSR ¶ 63).  The Probation Office has noted that a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(13)(A), because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense.  The application notes state that the defendant shall be deemed to qualify "if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000."  U.S.S.G. 2B1.1, comment. (n. 11(A)).  Moreover, "gross receipts from the offense" includes "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense."  Id., comment. (n. 11(B)).  Here, the Ernst & Young forensic analysis at trial made clear that defendant received and handled amounts well in excess of $1,000,000 through defendant's individual accounts.  Moreover, defendant handled the amounts described in Exhibit 1 while gambling in Caesar's Palace, which amounts were fraud proceeds or derived from the fraud.[8]  Of course, these amounts are only part of the total amounts transported and gambled in Las Vegas; as Trial Exhibits 180(1) through (6) and 183 demonstrate, millions of dollars were also gambled at the Bellagio and the Rio Hotel and Suites.

Defendants KUANG Wan Fang and YU Ying Yi also derived the following amounts with regard to the house each purchased in Richmond, British Columbia, Canada, in September 2001:

---

[8]   The exhibit describes "total volume" as the total of the absolute number for gains and losses, because the relevant issue is what amounts defendant derived from the fraud, as opposed to the net gambling activity.  For each trip, defendant derived a certain amount of fraud proceeds at the outset, from which defendant further derived a loss or gain.

It should be noted that, at the outset, each defendant derived a credit, which in most cases was in excess of the final loss for the trip; nevertheless, the government has defined the amounts derived as the more conservative (that is, smaller) resulting loss rather than the larger credit (unless the actual loss was in fact greater than the credit and made up with additional fraud proceeds).  See Trial Exhibits 181(2) at BOC-15117; 181(4) at BOC-15124; 181(20) at BOC-15137; 181(21) at BOC-15141; and 181(22) at BOC-15140 (Caesar's Palace summaries of gambling trips).  If the credit amounts were used, the derived amounts would be larger.

| DEFENDANT | ADDRESS OF HOUSE | TOTAL AMOUNT PAID IN U.S. DOLLARS (CANADIAN DOLLARS)[9] | EXHIBIT |
|-----------|------------------|--------------------------------------------------------|---------|
| KUANG Wan Fang | 6160 Udy Road | USD $496,911.64 (Can $783,772.31) | 140(7) |
| YU Ying Yi | 6171 Udy Road | USD $491,048.46 (Can $774,524.39) | 139(42) |

Finally, defendant was involved in or benefitted from the transactions for the purchase of the three Le Sommet luxury apartments in Hong Kong, which were purchased for a total of HKD 53.7 million (Trial Exhibit 242, page 2), or, based on an approximate rate of 8 Hong Kong dollars to 1 U.S. dollar, or USD $6.725 million; from this amount, each defendant's one-sixth derived benefit would be over USD $1.1 million.  Considering all of these amounts, the enhancement is amply supported by the evidence at trial.

2.     Role Adjustment/Guideline Section 3B1.1 (PSR ¶ 66).  The evidence at trial made clear by any standard of proof that defendant XU Chaofan was an organizer and leader of the fraudulent activity, which involved five or more participants.  With regard to the money laundering activity, the persons involved included XU Chaofan, XU Guojun, LIANG Shuxiang, YU Zhendong, HUI Yat-Sing (defendant XU Chaofan's cousin, who handled day-to-day operations at Ever Joint in Hong Kong), WONG Suet-Mui (HUI Yat-Sing's wife, who also worked at Ever Joint), KUANG Wa-Po (KUANG Wan Fang's brother, who resided in Canada and participated in the money transfers), Fion Xu Hui YU (YU Zhendong's wife), KUANG Wan Fang, and YU Ying Yi.  YU Zhendong identified XU Chaofan as the founder of Ever Joint and the leader who directed all of the activities in the scheme.  In addition, Fion Xu Hui YU identified XU Chaofan as the person in the Las Vegas trips who allocated gambling money among those travelling there.

In turn, the three-level enhancement for XU Guojun as a manager or supervisor is also warranted.  As the testimony of YU Zhendong stated, XU Guojun coordinated the movement of money to Hong Kong and within Hong Kong, as also demonstrated by the flow of funds through his personal accounts and the joint accounts he held with XU Chaofan.  In Kaiping, as

---

[9]     The relevant exchange rate is 1 Canadian dollar = 0.634 U.S. dollar.

demonstrated by the testimony of YU Hongbin, XU Guojun provided instruction and directions to employees to alter documents in connection with the 1995 audit.  In addition, XU Guojun also supervised the personnal at Ever Joint.

The four-level adjustment for XU Chaofan as an organizer or leader and the three-level adjustment for XU Guojun as a manager or supervisor under Guideline Section 3B1.1(a) is fully supported by the trial record.

3.    Abuse of a Position of Trust/Guideline Section 3B1.3 (PSR ¶ 67).  The positions of defendants XU Chaofan and XU Guojun as presidents of the Kaiping sub-branch allowed them to execute the money laundering scheme.  In particular, flows of funds from mainland China to Hong Kong would normally be subject to foreign exchange controls administered by China's State Administration of Foreign Exchange, and it was through the exercise of their positions as bank presidents that Xu Chaofan and XU Guojun were able to circumvent these controls and route the enormous sums involved in this case to Ever Joint.  The Guideline commentary makes clear that this adjustment applies in the case of a bank executive's fraudulent loan scheme.  U.S.S.G. § 3B1.3, comment. note 1.  Similarly, these defendants' status as high officials in the sub-branch allowed them to execute the scheme a lengthy period of time.

G.    Guideline Sentence/Guideline Section 5G1.2(d)  (PSR ¶¶ 104-106)

Because none of the individual counts against these defendants carries a statutory maximum term as long as the recommended Guideline sentence, Guideline Section 5G1.2(d) provides, "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."  Thus, the Court can impose consecutive terms on each count, with the sentence on each count being for the maximum terms of imprisonment.  See also United States v. Buckland, 289 F.3d 558, 570-72 (9th Cir. 2002) (en banc) (describing so-called "stacking" under Section 5G1.2(d)).  In Buckland, the Ninth Circuit held that if the narcotics counts in that case were each limited to a statutory maximum of 20 years, the district court could still impose a Guideline-

calculated term of 324 months, given its power under Section 5G1.2(d) to "stack" the statutory

maxima in the counts to achieve the 324-month sentence.  Similarly, this Court has the power to

run the individual counts consecutive to one another up to the Guideline sentence of life.

Here, for XU Chaofan and XU Guojun, the Court can do so to the extent of sixty-five

years, or the sum of the statutory maxima for Counts One through Three and Four through Six:

| COUNT AND STATUTE | TERM (IN YEARS) |
|---|---|
| Count One (18 U.S.C. §§ 1962(d) and 1963(a)) | 20 |
| Count Two (18 U.S.C. §§ 1956(h) and 1957(b)(1)) | 10 |
| Count Three (18 U.S.C. § 371) | 5 |
| Count Four (18 U.S.C. § 1546(a)) | 10 |
| Count Five (18 U.S.C. § 1546(a)) | 10 |
| Count Six (18 U.S.C. § 1546(a)) | 10 |
| TOTAL STATUTORY MAXIMUM | 65 |

H.    Reasonableness Analysis under 18 U.S.C. § 3553(a)

After the Supreme Court's decisions in United States v. Booker, 543 U.S. 220, 125 S. Ct.

738 (2005), and its progeny, the Ninth Circuit explained the relevant procedure in United States

v. Carty, 520 F.3d 984 (9th Cir. 2008) (en banc), in particular the relationship between the

Sentencing Guidelines and the factors described in 18 U.S.C. § 3553(a).  To effectuate the goal of

the Sentencing Reform Act to "'impose a sentence, but not greater than necessary' to reflect the

seriousness of the offense, promote respect for the law, and provide just punishment; to protect

the public; and to provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment," the Ninth Circuit explained that after determining the

applicable Guideline range and hearing from the parties:

> The district court should then consider the [18 U.S.C.] § 3553(a) factors to decide
> if they support the sentence suggested by the parties, i.e., it should consider the
> nature and circumstances of the offense and the history and characteristics of the
> defendant; the need for the sentence imposed; the kinds of sentences available; the
> kinds of sentence and the sentencing guideline range established in the Guidelines;
> any pertinent policy statement issued by the Sentencing Commission; the need to
> avoid unwarranted sentence disparities among defendants with similar records who
> have been found guilty of similar conduct; and the need to provide restitution to
> any victims.

Id. at 991 (citing 18 U.S.C. § 3553(a)(1)-(7) and Gall v. United States, 128 S. Ct. 586, 596-97 n.6

(2007)).  The Ninth Circuit also held that the sentencing court must support any sentence outside

the range by a justification, with "a major departure supported by a more significant justification than a minor one," and the sentencing court must explain the final sentence "sufficiently to permit appellate review," depending "upon the complexity of the particular case, whether the sentence chosen is inside or outside of the Guidelines, and the strength and seriousness of the proffered reasons for imposing a sentence that differs from the Guidelines range." Carty, 520 F.3d at 991-92.

For defendant XU Chaofan, the United States submits that the factors in § 3553(a) warrant the sentence recommended by the Probation Department. As the PSR has stated, the defendant was part of a conspiracy to steal nearly half a billion dollars from the victim Bank of China, displaying a level of greed difficult to imagine. The repercussions of the offense resulted not only in the inter-bank system and the reconfiguring of the Bank of China's clearing and payment system, but if the offense were unchecked, could have placed the solvency of the Bank of China in jeopardy. Indeed, the event was significant enough for the Bank of China to report it in its prospectus for its worldwide initial public offering in 2006, See http://www.boc.cn/en/common/third.jsp?category=1155523977100 (under heading for "Business," at page 43).

In addition to the factors relating to the seriousness of the offense, the promotion for respect for the law, and just punishment for the offense, there is also the need to afford adequate deterrence to criminal conduct. As the defendants' conduct in this case illustrates, not only was there an exploitable opportunity for massive fraud, but also a readily available access to the United States and ultimately an avenue of escape here, given the absence of an extradition treaty between the United States and China. This phenomenon is not an isolated occurrence in the past, but is rather an escalating trend that requires a strong deterrent. A senior associate for the Carnegie Endowment determined in 2007 that "[k]ickbacks for loan approval, massive theft by insiders, misuse of funds, and large-scale fraud are routine in Chinese banks, brokerage houses, insurance companies, and rural cooperatives." Minxin Pei, Corruption Threatens China's Future, Policy Brief 55 (Carnegie Endowment for Int'l Peace, Wash., D.C.), Oct. 2007, at 3, available at http://www.carnegieendowment.org/files/pb55_pei_china_corruption_final.pdf. The report notes

25

that in 2004, China's banking regulators uncovered 584 billion yuan (Renminbi) in misused funds (at the current exchange rate of 6.85 yuan to 1 US dollar, approximately USD$85 billion) and in 2005, 767 billion yuan in misused funds (that is, approximately USD$112 billion).  Id.  Finally, the report describes the estimate of China's law enforcement officials that over 800 suspects have escaped abroad with approximately 70 billion yuan directly involved in their cases.  Id. at 7.  This case is not an isolated phenomenon, but depicts an escalating trend in transnational criminal activity.  The United States cannot be viewed as a safe haven for overseas offenders who come to the United States to elude law enforcement and use the United States as a haven for masking their criminal activities and illegal proceeds.  When those criminals, as defendants here, abscond to the United States and commit crimes here, those criminals should receive the same punishment called for when the Guidelines and the Section 3553(a) factors are applied to the facts of their respective cases.  Adequate criminal punishment is the most direct means to deter this conduct, and the Probation Department's recommendation is necessary to afford adequate deterrence to criminal conduct to demonstrate to other similarly situated offenders that this conduct will be readily addressed in the United States should they choose to extend their criminal activity to this country.

As for defendants KUANG Wan Fang and YU Ying Yi, the same justifications support the Guideline sentences that the Probation Department recommends.  These defendants took part in a long-term scheme to steal massive amounts of funds from the Bank of China, enjoy the benefits of those funds, and lay the groundwork for escape to the United States once the scheme was discovered.  These defendants do not face the same exposure as defendants XU Chaofan and XU Guojun, because they did not assume an aggravating role in the offense, nor were they in a position of trust.  Nevertheless, the recommended sentence is an appropriate punishment for their acts, and the seriousness of the offense, the promotion of respect for the law, the need for proper punishment, and the affording of adequate deterrence are properly served by that sentence.

I.    Restitution (PSR ¶ 115)

As noted in the Government's Amended Motion for a Preliminary Order of Forfeiture, filed on December 15, 2008  (Doc. No. 706), there was a civil forfeiture of $3,552,944.00 in the Northern District of California, which had been seized from two bank accounts in the name of YU

Zhendong's brother.  These funds were returned to the Bank of China.  Accordingly, the amount of restitution should be reduced by that amount, so that the amount of restitution due should be $478,447,056.00.

J.      Objections to the Presentence Reports

As of the date of this filing, the government has not received notice of objections that any defendant may have to these reports.

K.      Expert Notice

The initial sentencing date of November 24, 2008 was continued by stipulation of the parties to January 30, 2009.  See Doc. No. 693.  That date was again continued by stipulation of the parties, for the last time, to the current date of May 4, 2009.  See Doc. No. 710.  In part, the continuances were based upon the defendants decision to utilize a "mitigation expert."  That report is due on April 3, 2009 (thirty days before the sentencing date).  Id.

L.      Conclusion

The government respectfully requests the Court to sentence defendant in accord with the Pre-Sentence Report and this sentencing position.


DATED:          March 16, 2009                    Respectfully Submitted,

                                                  GREGORY A. BROWER
                                                  United States Attorney

                                                  ERIC JOHNSON
                                                  Assistant United States Attorney


                                                  _____/s/_____
                                                  KRISTA TONGRING
                                                  Trial Attorney

                                                  RONALD CHENG
                                                  Special Trial Attorney

**EXHIBIT 1**
(Discussed in Memorandum, Subsection F1.b)

| CASINO / TRIP | XU Chaofan, aka HUI Yat Fai (XCF)<br><br>(EXHIBIT) | XU Guojun, aka HUI Kit Shun (XGJ)<br><br>(EXHIBIT) | KUANG Wan Fang (KWF)<br><br>(EXHIBIT) | YU Ying Yi (YYY)<br><br>(EXHIBIT) |
|---|---|---|---|---|
| Caesar's 2-16 to 2-17-09<br><br>(to 2-18-09 for XGJ) | ($338,300)<br>(Ex. 181(2) at BOC-15117) | ($50,400)<br>(Ex. 181(4) at BOC-15124) | | |
| Caesar's 11-24 to 11-26-99 | | | | ($12,900)<br>(Ex. 181(15) at BOC-15132) |
| Caesar's 9-30 to 10-3-00<br><br>(to 10-8-00 for KWF)<br><br>(from 10-6-00 to 10-9-00 for XGJ, YYY) | $1,494,000<br>(Ex. 181(9) at BOC-15118)<br><br>(Ex 181(20) at BOC-15137) | ($126,500)<br>(Ex. 181(13) at BOC-15125 to 15126)<br><br>(Ex 181(20) at BOC-15137) | ($113,200)<br>(Ex. 181(11) at BOC-15128)<br><br>(Ex 181(20) at BOC-15137) | ($50,300 + $62,000)<br>(Ex. 181(15) at BOC-15132 to 15133)<br><br>(Ex 181(20) at BOC-15137) |
| Caesar's 4-30-01 to 05-01-01<br><br>(from 05-06-01 to 05-08-01 for YYY) | ($2,995,000)<br>(Ex. 181(9) at BOC-15118)<br><br>(Ex. 181(21) at BOC-15141) | | $108,000<br>(Ex. 181(11) at BOC-15128)<br><br>(Ex. 181(21) at BOC-15141)<br><br>$9,100<br>(Ex. 181(11) at BOC-15129)<br><br>(Ex. 181(21) at BOC-15141) | ($497,500)<br>(Ex. 181(15) at BOC-15133)<br><br>(Ex. 181(21) at BOC-15141) |

28

| | | | |
|---|---|---|---|
| Caesar's 10-02-01 to 10-06-01<br><br>(to 10-5-01 for KWF, YYY) | ($1,999,000)<br>(Ex. 181(9) at BOC-15119)<br><br>(Ex. 181(22) at BOC-15140)<br><br>($1,946,500)<br>(Ex. 181(9) at BOC-15119 to 15120)<br><br>(Ex. 181(22) at BOC-15140) | ($110,000)<br>(Ex. 181(13) at BOC-15126 to 15127)<br><br>(Ex. 181(22) at BOC-15140) | $35,400<br>(Ex. 181(11) at BOC-15129)<br><br>(Ex. 181(22) at BOC-15140) | $151,300<br>(Ex. 181(15) at BOC-15133 to 15134)<br><br>(Ex. 181(22) at BOC-15140) |
| Caesar's 10-15-01 | ($591,000)<br>(Ex. 181(9) at BOC-15120)<br><br>(Ex. 181(23) at BOC-15142) | ($383,000)<br>(Ex. 181(13) at BOC-15127)<br><br>(Ex. 181(23) at BOC-15142) | | |
| TOTAL VOLUME (ABSOLUTE NUMBER TOTALS FOR GAINS AND LOSSES) | $9,363,800 | $669,900 | $265,700 | $774,000 |

29