MITCHELL POSIN, ESQ.
601 South Tenth Street
Las Vegas, Nevada 89101
Tel. (702) 382-2222
Fax (702) 382-7496
Nevada State Bar No. 2840
Attorney for Defendant
CHAO FAN XU

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:02-cr-00674-PMP-LRL |
| | ) | |
| CHAO FAN XU, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT XU CHAO FAN'S SENTENCING MEMORANDUM
INCLUDING OBJECTIONS TO PRESENCE REPORT
AND MOTION FOR DOWNWARD DEPARTURE**

CERTIFICATION:  This Objection is timely filed.

COMES NOW the Defendant, XU Chao Fan, by and through his attorney, MITCHELL L. POSIN, ESQ., and hereby submits his sentencing memorandum, objects to the Presentence Investigation Report prepared for the above-entitled case, and moves for a downward departure.

DATED this _7_ day of _April___, 2009.

Respectfully submitted,

_____/S/_____
Mitchell L. Posin, Esq.

<u>Objections</u>

The Defendant hereby objects to portions of the following paragraphs of the Presentence Report, as more fully set forth hereinafter:

Paragraphs 9, 13, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 33, 35, 37, 38, 44, 45, 46, 47, 51, 52, 54, 56, 57, 59, 62, 63, 64 67, 77, 78, 79, 80, 81, 82, 83, 84, 90, 92, 93, 96, 105, 106, 120, 121, 122 and 123.

**Facts**

Defendant XU objects to the allegations in the PSR that *"the codefendants acted together in the attempt to defraud the Bank of China of at least $482 million dollars,"* as alleged in paragraph 13, and continued in paragraphs 14 through 27.

Although the government has used the number of $482 million, it is submitted that the evidence elicited at trial did not uniformly support such a figure, nor is such a figure a necessary corollary of the guilty verdict.  Rather, it is the recollection and submission of the undersigned that numerous percipient witnesses of the events, who were called by the government, testified to the effect that approximately $170 million of the bank's money was lost in currency trading in the early 1990's, and that this loss was essentially a bad investment decision on behalf of the bank rather than any attempt to embezzle or convert the money in question.  It was further the testimony that approximately $300 million dollars was loaned from the bank to the Kaiping Polyester Factory and other industrial enterprises, and that while some unknown portion of this money was ultimately sent to various Hong Kong entities controlled by the defendants, that machinery and raw materials of an unknown value were obtained and sent back to the

industrial concerns.  It was further the testimony that some $10 million or more that was loaned by the bank was used to construct the 32 story Everjoint Peninsula Hotel and adjoining office building that continues to house the Bank of China in Kaiping. Obviously, the building in Kaiping in which the Bank of China remains cannot be said to form any part of a loss for relevant conduct amount.

As regards Mr. XU's relationship with Kwang Wan Fang and Mei Xie Peng as discussed in paragraph 8 and paragraphs 28 through 35 and 47 through 53 of the PSR, it is likewise submitted that the government's proffered testimony, particularly that of Mei Xie Peng, is consistent with Mr. XU's submission that he was never in fact married to Ms. Kwang, and that his marriage to Mei Xie Peng was a legitimate.  Again, it is submitted that the allegations found in the above-cited paragraphs are not necessary to any guilty verdict, and especially not counts four through six of the Second Superseding Indictment, which allege only that Mr. XU used *"any false claim or statement"* in order to obtain a United States visa in the name of Hui Yat Fai.

While the leadership role adjustment found in paragraph 66 is not disputed for purposes of sentencing, defendant XU Chao Fan does object to specific instances in the PSR where he is alleged to have initiated various plans, and then forced, controlled, ordered, or directed other individuals to perform many actions in pursuit thereof. Examples are found in paragraphs 16, 17, 30, 31, 37, 38, 44, 47, and 51.

**Guideline Calculations**

**Application of U.S.S.G. §2S1.1**

Paragraph 63 of the PSR states that *"the defendant committed the specified*

*unlawful activity of fraud, and a scheme and attempt to defraud against a foreign bank . . . .*"[1]  The paragraph goes on to state that therefore, under 2B1.1, *"30 levels must be added as the loss exceeded $400,000,000.00 . . . ."*  This is incorrect.

U.S.S.G. §2S1.1. currently[2] provides that the base offense level for Laundering of Monetary Instruments and Engaging in Monetary Transactions in Property Derived from Unlawful Activity is *"the offense level for the underlying offense from which the laundered funds were derived,"* but only if: *"(A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined."* (Emphasis added).  It is submitted that here, the defendant did not commit the underlying offense of bank fraud, as suggested in the PSR.  It is further submitted that the offense level for the underlying offense cannot be determined.

In the case of United States v. Lewis, 67 F.3d 225 (9th Cir. 1995), the defendant was the branch manager of the Portland, Oregon branch of the Hong Kong and Shanghai Bank.  The defendant made a large authorized loan to an entity called "Financial Reserve Group," or FRG.   After learning that the principals of FRG were the targets of a criminal grand jury investigation, the defendant concluded that it was unlikely that FRG's debt would ever be repaid. Rather than reporting the bad debt to his superiors, which would

---

[1] Defendant likewise objects to Paragraph 9 of the PSR as irrelevant for the reasons discussed hereinafter regarding paragraph 63: as a matter of United States law, Defendant does not, and could not stand convicted of committing Bank Fraud against the Bank of China.

[2] U.S.S.G. 2S1.1 was amended in 2001, as discussed infra.

4

have caused the branch to reflect a loss, Lewis agreed to make an unauthorized loan to "Diers," an FRG principal who had been exonerated in the criminal investigation. Diers agreed to use part of the loan to pay off the FRG debt. This allowed the Portland branch to carry a profit on its books for that year. With the remaining portion of the loan, Diers acquired real estate for a development project.  The defendant continued to make unauthorized loans to Diers for the development project, each of which ultimately formed the basis for a count of bank fraud.

The Lewis Court reversed the convictions, stating, *"[w]e hold that HKSB's Portland branch was not "operating under the laws of the United States" within the meaning of § 1344(b)(5), and that the district court therefore erred in denying Lewis' motion to dismiss the bank fraud charges for lack of jurisdiction."*[3]

Similarly in U.S. v. Ali, 266 F.3d 1242, (9th Cir. 2001). The defendant was convicted of bank fraud.  The Ninth Circuit reversed, despite testimony from a loan officer claiming the bank was federally insured, and despite the introduction of an insurance certificate from several years earlier.  The Court stated, *"we hold that this evidence is insufficient as a matter of law to establish beyond a reasonable doubt that the bank was federally insured at the time of the offenses."*

If the defendants in Lewis and Ali could not be convicted of the United States

---

[3] The Lewis Court notes that before the enactment of § 1344 as part of the Comprehensive Crime Control Act of 1984, no federal provision specifically criminalized bank fraud. United States v. Lewis, 67 F.3d 225 (9th Cir. 09/28/1995)

crime of Bank Fraud for defrauding a U.S. branch of a foreign bank,[4] then *a fortiori* the

defendant in the instant case could not have been convicted under the then version of 18

U.S.C. § 1344. Indeed, the government has not charged Mr. XU with violating 18 U.S.C.

§ 1344, and nor is 18 U.S.C. § 1344 mentioned in the Second Superseding Indictment.[5]

Although 18 U.S.C. § 1344 has been amended since the Lewis case to delete the

requirement that the financial institution which is defrauded be federally chartered or

insured,[6] there is still a requirement that the financial institution be, in fact, a "financial

institution."  Thus, we must now determine whether the Kaiping branch of the Bank of

---

[4] Prior to 1990, 18 USC 1344 provided as follows:
*Whoever knowingly executes, or attempts to execute, a scheme or artifice--*
*``(1) to defraud a federally chartered or insured financial institution; or*
*``(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both."*

[5] See also U.S. v. Moran, 312 F.3d 480 (1st Cir. 2002), , U.S. v. Rigas, 490 F.3d 208(2d Cir. 2007), U.S  v. Jimenez, (3d Cir. 2008), U.S. v. Ross, 502 F.3d 521 (6th Cir. 2007), U.S. v. Waldroop, 431 F.3d 736 (10th Cir. 2005), all regarding the definition of "bank fraud" as requiring the element of a federally insured financial institution.

[6] The current version of 18 USC 1344 provides as follows:
*Whoever knowingly executes, or attempts to execute, a scheme or artifice--*
*(1) to defraud **a financial institution**; or*
*(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, **a financial institution**, by means of false or fraudulent pretenses, representations, or promises;*
*shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.* (Emphasis added)

6

China was a "financial institution" according to current U.S. law.

**The Kaiping branch of the Bank of China is not a "financial institution"**

Under 18 U.S.C. §20,[7] certain branches of foreign banks may come within the definition of a "financial institution," but **only** if that branch is *"a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978)."*

The International Banking Act of 1978 is codified at §12 U.S.C. § 3101 et seq., and provides that a "branch" of a foreign bank *"means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received."* (Emphasis added). An "agency" of a foreign bank *"means any office or any*

[7] 18 U.S.C. § 20 provides as follows:
*Financial institution defined*
*As used in this title, the term ``financial institution'' means--*
*(1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);*
*(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;*
*(3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;*
*(4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;*
*(5) a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);*
*(6) a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act;*
*(7) a Federal Reserve bank or a member bank of the Federal Reserve System;*
*(8) an organization operating under section 25 or section 25(a) of the Federal Reserve Act; or*
*(9) a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978).*

7

*place of business of a foreign bank **located in any State of the United States** at which credit balances are maintained incidental to or arising out of the exercise of banking powers, checks are paid, or money is lent but at which deposits may not be accepted from citizens or residents of the United States."*

The Kaiping Branch of the Bank of China is simply, and unquestionably, not a "financial institution" under 12 U.S.C. § 3101, so to the extent that paragraph 63 of the PSR appears to reference 18 §USC 1344 (by stating that the underlying offense to be applied under §2S1.1 is "a scheme and attempt to defraud against a foreign bank), paragraph 63 is therefore incorrect.

**The offense level of the underlying crime cannot be determined**

As noted above, U.S.S.G. §2S1.1. provides that the base offense level for Laundering of Monetary Instruments and Engaging in Monetary Transactions in Property Derived from Unlawful Activity is *"the offense level for the underlying offense from which the laundered funds were derived,"* only if . . . *(B) the offense level for that offense can be determined."*[8]

This Court has heard much testimony at trial concerning monies going out of the Bank of China.  However, it is submitted that, having heard the multiple stories from Chinese officials and other witnesses testifying from China, the months of testimony did little or nothing to prove what amount actually went from the Bank of China to the

---

[8] Application note 3 provides as follows:
*Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under §1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine*

Defendants.  The testimony of the percipient witnesses such as YU Zhen Dong, Liang

Shu Xiang, and HU Yong Bin was not only suspect due to questions of improper

treatment, but was contradictory in many instances to the testimony of the various

auditors and experts.  As asserted above, the figure of $482 million seems to be

composed of several components, even according to the government's witnesses: money

lost in currency speculation on behalf of the bank, money loaned to the Polyester Factory,

some of which is alleged to have been converted to the use of the defendants, and money

which has been identified as having been used to purchase goods and machinery which

benefitted either the Polyester Factory or the Bank, and which left both factory and Bank

with sizeable assets in the form of real estate and buildings.  The $482 million figure is

not tenable as a relevant conduct amount. Thus, the facts of this case meet neither prong

(A) nor prong (B) of 2S1.1(a)**(1)**, and we must turn to 2S1.1(a)**(2)**.

Section 2S1.1(a)**(2)** provides that the Court must use 8 plus the number of offense

levels from the table in §2B1.1 corresponding to the value of the laundered funds.

**Value of the laundered funds**

The pre-2001 amendment version of § 2S1.1 contained a table that provided for

an increase in the base offense level based on the "value of the funds."

In U.S. v. Barrios, 993 F.2d 1522 (11th Cir. 1993), which involved the application

of § 2S1.1 before its amendment in 2001, the defendant Barrios sent some drug proceeds

to another individual who deposited the funds in bank accounts in three countries. The

other individual later Nasser issued multiple checks back to Barrios, totaling considerably

more money. Barrios argued that he should be held responsible only for the initial

9

deposit, and not the interest earned. The Ninth Circuit ruled that *"whatever interest was earned on the original drug proceeds . . . stayed with the funds throughout the remainder of the laundering process."*

In United States v. Paley, 442 F.3d 1273 (11th Cir. 2006), the Eleventh Circuit ruled that Barrios no longer applies to the 2001 amendment to §2S1.1, which no longer uses *"the value of the funds"* as a specific offense characteristic, and no longer even contains a table. Instead, § 2S1.1 now provides that the *"value of the **laundered** funds"* should be used in determining the offense level.

Application note 1 to the amended provision provides:

> *"Laundered funds" means the property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957.*

> *"Laundering funds" means making a transaction, financial transaction, monetary transaction, or transmission, or transporting or transferring property, funds, or a monetary instrument in violation of 18 U.S.C. § 1956 or § 1957.*

So what is the amount of the laundered funds? As charged in the Second Superseding Indictment, the defendants *"conspired to knowingly engage . . . in monetary transactions by, through, and to **a financial institution** . . . ."* (Emphasis added). The "laundered funds" thus were those that related to monetary transactions by, through, and to **financial institutions**. And, as discussed above the term "financial institution" does not include the Kaiping sub-branch of the Bank of China.

Thus, whichever way we approach the issue of relevant conduct, we are brought back to the charges of which the defendant stands convicted, which do, and could not

10

include a charge of committing bank fraud against the Bank of China.  Using only

"laundered funds," which were involved in "monetary transactions by, through, and to a

financial institution," the relevant conduct amount under 2S1.1 is considerably less than

$482 million.

**The use of foreign conduct is generally disfavored under the guidelines**

As noted in the Second Circuit case of <u>United States v. Azeem</u>, 946 F.2d 13 (2nd

Cir. 1991), to determine whether the use of a foreign transaction *"is proper under the*

*Guidelines, we must establish their intent with respect to the issue of foreign crimes and*

*activities. As in any case of statutory interpretation, our starting point must be the*

*language of the Sentencing Guidelines themselves. See Lewis v. United States, 445 U.S.*

*55, 60, 63 L. Ed. 2d 198, 100 S. Ct. 915 (1980)."*

The Azeem Court went on to hold that the use of foreign crimes under the

Guidelines has a very limited and circumscribed role:

> [T]he Guidelines . . . note that foreign sentences may not be used
> in computing a defendant's criminal history category, but may be used for
> upward departures from the otherwise applicable range. See U.S.S.G. §§
> 4A1.2(h), 4A1.3(a).
>     From these provisions, it follows that Congress, while it has not
> remained entirely silent, has chosen to assign to foreign crimes a rather
> limited role. We decline to find that Congress intended to require that
> foreign crimes be considered when calculating base offense levels . . . .
>     Moreover, there are good reasons to avoid creating a new use for
> foreign crimes in sentencing. To do so would require distinguishing
> between activities that violate both domestic and foreign law and those
> which violate only domestic law or only foreign law. Examples of
> activities that violate one, but not both, foreign and domestic laws could
> be the use and sale of certain drugs that would have violated our law, but
> not the foreign law where sold and used, or a certain use of alcohol that
> violates the foreign law where used but would not have done so under
> domestic law. To permit foreign crimes to figure in fixing the base offense

11

1
2

*level would require courts to perform a careful comparative analysis of foreign and domestic law in such instances. At some point the advantages of simplicity should prevail. This is one of them.*

3
4
5
6
7
8

 *Were a global approach required, we would soon find it necessary to determine the appropriate evidence that must be produced by the prosecution to show that the activity occurred and that it violated foreign law. For example, we would have to decide whether an arrest or conviction by the foreign country is necessary for inclusion and, if so, whether it should be disregarded if plainly unconstitutional by our law. The fact that section 4A1.2(h) of the Guidelines allows upward departures only for foreign sentences, as opposed to uncharged crimes or arrests, apparently reflects some of these concerns. See U.S.S.G. § 4A1.2(h).*

9
10

 *Without a clear mandate from Congress, we decline to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate. These issues are best considered and resolved by Congress.*

11

In the case of United States v. Ford, 989 F.2d 347 (9th Cir. 1993), the Court held

12
13
14
15
16
17
18
19
20
21
22

 ***It is undisputed that no domestic jurisdiction criminalizes fraud in Canada.*** *Thus, Ford's Canadian conduct does not constitute "a criminal offense under federal, state, or local law." U.S.S.G. § 2T1.3(b)(1) application note 1.[9] We need not reach whether the district court was correct in its holding that Ford's fraudulent acts, if perpetrated within the United States, would constitute criminal offenses. Even assuming that the district court was correct, the fact remains that Ford's acts were not perpetrated within the United States. All of Ford's income-generating fraudulent acts took place in Canada, outside of United States jurisdiction. The Commentary does not define "criminal activity" as "conduct that would constitute a criminal offense under federal, state, or local law," but as "conduct constituting a criminal offense under federal, state, or local law." Id. (emphasis added). The Guidelines do not speak to hypothetical criminal offenses, but to those the defendant actually committed. None of Ford's Canadian activities constitute criminal offenses in any domestic jurisdiction.* (Emphasis added).

23
24
25

 *Rose permits trial courts to treat fraudulently derived funds as "relevant conduct" for sentencing purposes under S 2S1.1 only when such funds are co-extensive with the sums involved in money laundering. U.S.v. Hanley, 190 F.3d 1017, (9th Cir. 1999)*

26
27

 [9] Application note 3, U.S.S.G. § 2T1.3(b)(1) has since been amended to refer to *"federal, state, local, or foreign law"*

28

The Guidelines themselves suggest a disinclination to include even state crimes, much less foreign crimes. Thus, the Introductory Commentary to USSG § 2B1.1 states that *"[t]hese guidelines apply to offenses prosecuted under a wide variety of federal statutes, **as well as offenses that arise under the Assimilative Crimes Act.** (Emphasis added).[10]"* By specifically referencing the Assimilative Crimes Act, which, unlike  has a particularly geographic limitation, the drafters appear to have a geographically restricted view of the reach of the guidelines.

In United States v. Chunza-Plazas, 45 F.3d 51 (2nd Cir. 01/23/1995), the Second Circuit discussed the role of foreign actions under the guidelines, noting:

> *. . . not even foreign sentences may be used initially in determining the criminal history category, but they may be used, like a pending charge, as the basis for an upward departure. In light of these precise provisions as to how charges and foreign sentences may be used, it is significant that nowhere do the guidelines specifically authorize the use of unrelated, uncharged foreign criminal conduct, or even foreign arrests, for a departure in the criminal history category.*

**Ex Post Facto**

_____The above arguments regarding the application of U.S.S.G. §2S1.1 are based on the current (2008) guidelines. Should the Court accept those arguments, the defendant will have no objection to the use of those guidelines. However, should the Court reject the above arguments regarding the relevant conduct amount, a sentence using the current guideline could potentially run afoul of the *ex post facto* prohibition.

---

[10] The Assimilative Crimes Act, which makes state law applicable to conduct occurring on lands reserved or acquired by the Federal government as provided in 18 U.S.C. § 7(3), when the act or omission is not made punishable by an enactment of Congress. It is significant that the commentary specifically mentions the Act, as it very clearly gives a geographic limitation to the operation of this Guideline.

The current version of U.S.S.G. §2S1.1 refers back to §2B1.1.  The PSR concludes that under §2B1.1, the base offense level is 40.  Using the pre-2001 version of U.S.S.G. §2S1.1, which does not refer back to §2B1.1, the base offense level for the same relevant conduct amount would be 33.

In United States of America v. Beardslee, 197 F.3d 378 (9th Cir. 1999), the Ninth Circuit has given a concise explanation of the issues involved in the context of a conspiracy whose duration, as charged, spans the time when a more severe version of the guidelines went into effect:

> *Normally, a district court is to apply the version of the Sentencing Guidelines in effect on the date of sentencing. United States v. Warren , 980 F.2d 1300, 1304 (9th Cir. 1992). However, an exception to this rule exists where application of an amended version of the guidelines would violate the Ex Post Facto Clause. See id. (citing United States v. Castro, 972 F.2d 1107, 1112 (9th Cir. 1992)). If the underlying offense is a continuing offense, and continued after the relevant amendment has been made, the amended guidelines may be applied without offending the Ex Post Facto Clause. If, however, the underlying offense is a non-continuing offense that occurred before the amendment, or a continuing offense that was completed entirely before the amendment, the defendant must be sentenced under the relevant provisions of the guidelines in effect at the time the offense occurred. See id.*

Conspiracy is a continuing offense. See Castro, 972 F.2d at 1112. Thus, the question arises whether the conspiracy can have ended before the date charged in the Indictment as the ending date.  Fortunately for Mr. XU, the Ninth Circuit has answered that question in the affirmative.

In Beardslee, the defendant was convicted of a conspiracy that was charged as *"[b]eginning in or about October of 1989, and continuing thereafter through on or about April 1, 1993."*   Nonetheless, and despite the fact that the Indictment alleged two specific

14

acts in furtherance of the conspiracy by the defendant *after* the effective date of the later

guidelines, the Ninth Circuit approved the District Court's use of the 1989 sentencing

guidelines.  In approving the District Court's approach, the Ninth Circuit stated, *"These*

*subsequent acts bear only a tenuous relationship to Beardslee's continuing involvement*

*in the conspiracy."*  In the instant case, the latest dated overt act in the Second

Superseding Indictment is from April 7, 2001.   Thus, if the Court is not inclined to

follow the above arguments regarding §2S1.1, it is requested that the Court utilize a pre-

2001 version of the guidelines.

**Position of Trust**

XU Chao Fan respectfully objects to paragraph 67, abuse of a position of trust.  In

U.S. v. Morales-Olivarria, 119 F.3d 8 (9th Cir., 1997), the Ninth Circuit reversed the

District Court's imposition of a position of trust enhancement against a defendant

convicted of conspiracy to bring in illegal aliens, and of bringing illegal aliens into the

United States in violation of, *inter alia*, 18 U.S.C. §371 based on his employment as a

Mexican immigration official, holding that the victim in that case was the United States,

and that, *"analyzing the crime from the perspective of the United States, the 'victim' of*

*this crime, it is clear that Morales-Olivarria held no special position of trust vis-a-vis the*

*United States. His position as a Mexican immigration official is therefore not grounds for*

*applying the 'position of trust' enhancement."*

In the instant case, as discussed in several sections above, the United States holds

no brief to protect the people and institutions of China from criminal behavior.  Indeed,

the attorneys for the government have many times stated that this case is not about a

crime against China, but a crime against the United States.  Thus, it is submitted that the victim in the instant case is likewise the United States.  A role adjustment under §3B1.3 is therefore improper.

**Relocation to another jurisdiction; scheme committed from outside United States**

The PSR recommends a two level upward under §2B1.1(b)(9)(A).  This adjustment makes no sense in the current situation.  First of all, there is no proof that he "relocated to another jurisdiction in the effort to avoid law enforcement."  Rather, the indication is that he was continuing to battle a civil suit in Canada, and had no apparent reason to know that he was facing arrest, so it is speculative at best to say he was relocating for any reason other than to find a lower cost of living.  As to the "fraudulent scheme being committed *from* outside the United States, it would be much more accurate to say that the scheme simply was committed outside the United States entirely.  There has never been any evidence whatsoever that any defendant sought to, tried to, or did defraud any American, or anyone in America *from* outside the United States.  This provision would seem to apply to someone who, for instance, withdrew money from an American's bank account, while sitting safely in Nigeria.  That is simply not the case here.

**Motion for Downward Departure**

Mr. XU hereby moves for a downward departure on several grounds, more fully discussed below.  As the Court is free to choose a sentence that is outside the guideline range even without granting a departure, the substantive discussion of the bases for a departure is included below with the discussion of the factors found in §3553.

## Appropriate Sentence That Is Sufficient, But Not
## Greater than Necessary, Under 18 U.S.C. § 3553 (a)

In <u>U.S. v. Rodriguez-Rodriguez</u>, 441 F.3d 767 (9th Cir. 2006), the Ninth Circuit stated, *"[m]any times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [§ 3553(a)(2)]."*

Since the case of <u>U.S. v. Booker</u>, 543 U.S. 220 (2005), in which it was held that the sentencing guidelines are advisory rather than mandatory, it has been the task of the District Court to apply each of the factors set forth in 18 U.S.C. § 3553 (a) must therefore be considered in fashioning the appropriate sentence. These factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

In <u>Rita v. U.S.</u>, 127 S.Ct. 2456 (2007), the United States Supreme Court stated that, although a Court of Appeal may treat a guideline sentence imposed by a District Court as presumptively reasonable, the presumption was "an appellate court presumption

17

[that] applies only on appellate review."  They therefore held that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." Id.

The Supreme Court likewise held in Gall v. United States, 128 S.Ct. 586 (U.S. 12/10/2007) that the Circuit had improperly reversed the District Court's sentence of probation, when the guideline range called for 30 to 37 months of imprisonment.  The Supreme Court stated:

> A district court should begin by correctly calculating the applicable Guidelines range. The Guidelines are the starting point and initial benchmark but are not the only consideration. After permitting both parties to argue for a particular sentence, the judge should consider all of 18 U. S. C. §3353(a)'s factors to determine whether they support either party's proposal. He may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented. If he decides on an outside-the-Guidelines sentence, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variation. He must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing. In reviewing the sentence, the appellate court must first ensure that the district court made no significant procedural errors and then consider the sentence's substantive reasonableness under an abuse-of-discretion standard, taking into account the totality of the circumstances, including the extent of a variance from the Guidelines range, but must give due deference to the district court's decision that the §3553(a) factors justify the variance. That the appellate court might have reasonably reached a different conclusion does not justify reversal.

In U.S. v. Sachsenmaier, 491 F.3d 680 (7th Cir. 2007) the Court held that, "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a

18

guideline sentence."

**Compulsive Gambling**

In <u>United States v. Cockett</u>, 330 F.3d 706, 2003 Fed.App. 0166 (6th Cir. 2003), the defendant was charged with aiding and assisting in the preparation of a false tax return.  The District Court departed downward from a guideline range of 15 - 21 months to probation, based on the defendants psychological issues.  The Ninth Circuit upheld the sentence, stating:

> *The second question is whether it is possible to conclude that Cockett's mental disorders contributed to her offense. The government lays out a very convincing argument that Cockett was intellectually sophisticated, understood that she was lying on the forms and violating the law, and was in control of her behavior to the point where she sought out clients and assisted these clients in filing false tax returns in order to receive refunds. However the psychologists contend that Cockett was significantly impaired in her ability to understand that what she was doing was wrong. Not that she didn't know that she was technically lying on the forms, or that she did not understand that she was helping the women for whom she prepared the taxes to lie, but rather that her judgment was impaired so that she understood her actions as helping these women, and thus she had rationalized the lies.*

Thus, the mere fact that a convicted defendant is educated, or carried on a sophisticated criminal activity, is no bar to the use of  §5K2.13.

In <u>United States v. Ruff</u>, 535 F.3d 999 (9th Cir. 08/01/2008), despite a guideline range of 30-37 months, the Ninth Circuit approved the District Court's sentence of one year and one day in a residential center, where the defendant could receive counseling for his gambling addiction, participate in work release, and have visitations with his 11 year

old son.  The Court approvingly[11] noted that the District Court had cited:

> *mitigating factors, including: (1) Ruff's history of strong employment; (2) his cooperation and "clear[ ] remorse[ ]"; (3) his support from his siblings; (4) the absence of potential risk to the public and the appropriateness of restitution; and (5) his mental health issues and gambling addiction. With respect to this final factor, Ruff admitted that he had lost approximately $200,000 to compulsive gambling* . . . . (emphasis added).

In <u>United States v. Vieke</u>, 348 F.3d 811 (9th Cir. 11/03/2003), the Ninth Circuit approved the District Court's downward departure under §5K2.20 based in part on the *"pathological nature of the [gambling] addiction . . . ."*  Although the district court in <u>Vieke</u> declined to depart on the basis of diminished capacity, this case is notable as a pre-<u>Booker</u> case in which a departure on the basis of a gambling addiction was nonetheless granted by the District Court, and approved by the Ninth Circuit.

In <u>United States v. Sadolsky</u>, 234 F.3d 938 (6th Cir. 2000), the Circuit court upheld a downward departure under § 5K2.13 for a defendant convicted of fraud, who suffered from a gambling compulsion.

In <u>U.S. v. Liu</u>, 267 F.Supp.2d 371 (EDNY 2003), the District Court departed from the Guidelines based on a report using the criteria found in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000), or as it is more commonly known, DSM-IV.

Compulsive gambling has gained recognition as a legitimate psychological condition in various areas of the law.  See, e.g., <u>Calling a Lemon a Lemon: Regulating</u>

---

[11] The Ninth Circuit referred to *"the District Court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence."*

Electronic Gambling Machines To Contain Pathological Gambling, Bradley S. Fiorito,

100 Northwestern U. L. Rev. 1325 (2006).

In the instant case, Mr. XU has been evaluated by Dr. Eddie Chiu, a prominent[12]

Chinese-American psychologist who focuses on Asian-Americans with gambling

disorders.  Dr. Chiu has prepared a report which likewise utilizes the criteria found in the

DSM-IV, and is based on testing including the South Oaks Gambling Screen (SOGS),

and the Hopkins Symptom Checklist (Chinese Version).  Dr. Chiu concludes as follows:

> *Based upon the clinical interviews and relevant screening tools, Mr. Xu*
> *has experienced mild depression and he is a pathological gambler. His*
> *clinical presentation appears to meet the DSM-IV criteria for the*
> *following diagnosis:*
> > *Axis I:  Depressive Disorder, NOS Adjustment Disorder with Depressed Mood (Chronic S*
> > *Pathological Gambling*

Based on his meeting the DSM-IV criteria, it is submitted that Mr. XU should

receive a downward departure from the appropriate Guideline range under §5K1.13, or in

the alternative, that after the Court has determined Mr. XU's offense level under the

Guidelines (including any departures) that the Court should take his mental condition into

account as a mitigating factor under § 3553.

**Sentencing disparity**

Even prior to Booker, the Ninth Circuit has recognized that the need to avoid

---

[12] See, e.g. http://www.sacbee.com/ourregion/story/1681279.html
http://asianweek.com/2001_04_06/bay1_gambling.html
http://www.casinogamblingweb.com/gambling-news/casino-gambling/chinese_speaking_
problem_gambling_therapy_drawing_rave_reviews__50641.html
http://www.asianmentalhealth.org/Chiu%20Gamblers_New.pdf
www.coalitionny.org/news_resources/briefs/2007/documents/GamblingConferenceProgra
m.doc

sentencing disparity could justify a substantial downward departure.  Thus, in United

States v. Tzoc-Sierra, 387 F3d 978 (9th Cir. 2004), the Ninth Circuit upheld a departure

down to 36 months, despite a guideline range which called for 46 to 57 months.  In

upholding the sentence, the Court noted that *"[i]t seems apparent from the record . . .*

*that the factor that was of paramount importance to the district court was the disparity*

*between Tzoc-Sierra's recommended sentence and the sentences of his co-defendants.*

Similarly, in U.S. v. Daas, 198 F.3d 1167 (9th Cir. 1999), the Court held:

> *Downward departure to equalize sentencing disparity is a proper*
> *ground for departure under the appropriate circumstances. See 28*
> *U.S.C.S 991(b)(1)(B); U.S.S.G. Ch. 1, Pt. A, p.s. 3. ("Congress sought*
> *reasonable uniformity in sentencing by narrowing the wide disparity in*
> *sentences imposed for similar criminal offenses committed by similar*
> *offenders."). Indeed, a central goal of the Sentencing Guidelines is to*
> *eliminate sentencing disparity. See Koon, 518 U.S. at 113 ("The goal of*
> *the Sentencing Guidelines is, of course, to reduce unjustified disparities*
> *and so reach towards the evenhandedness and neutrality that are the*
> *distinguishing marks of any principled system of justice.").*
>     *Here, the record indicates that the district court believed*
> *incorrectly that it lacked the authority to depart downward based on*
> *sentencing disparity. Because the district court actually had this authority*
> *but mistakenly failed to exercise it to determine whether the facts here*
> *warranted departure, this court remands for findings as to whether a*
> *downward departure is appropriate.*

Post Booker, the ability of the District Court to impose a lower sentence to avoid

sentencing disparity has increased.  Thus, in United States v. Krutsinger, 449 F.3d

827(8th Cir. 2006), the Eighth Circuit upheld the District Court's imposition of a twenty

four month sentence, despite a guideline range of seventy to eighty-seven months, where

the principal reason for the lower sentence was the District Court's attempt to avoid

sentencing disparity.  The Eighth Circuit stated:

*We are assisted in this case by a district judge that made a thorough and careful record of the reasons for the sentence in each case. The judge was clearly troubled by, and ultimately determined his sentence based on, the § 3553(a)(6) factor: "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."*

The Court went on to hold:

*We cannot say the district court abused its discretion in fashioning a sentence that attempted to address the disparity in sentences between two nearly identically situated individuals who committed the same crime in the same conspiracy. The only distinction the government points to is the timing of the indictments. There will be many cases where a defendant receives a higher Guidelines range when he or she pleads or is tried later in the conspiracy, after the government has more fully developed its case. However, under the facts of this case, we cannot say the district court improperly applied § 3553(a)(6) or abused its discretion.*

In <u>Krutsinger</u>, the District Court's sentence, upheld by the Circuit, attempted to avoid disparate sentences, even though, as the Eighth Circuit noted *"[b]y the time she was sentenced, the government had developed more information about the scope of the conspiracy and was by then able to attribute [additional amounts of controlled substances as relevant conduct]."* By contrast, in the instant case, the government has not developed any more information about the scope of the conspiracy since the time of Yu Zhen Dong's sentencing that would indicate that additional or greater amounts of money were involved in the conspiracy. Rather, the recommendation of the PSR, in which the government has concurred, simply uses a figure, $482 million, which was equally known to the government at the time of Yu Zhen Dong's sentencing. If there was a need to avoid disparity in <u>Krutsinger</u>, that need is far greater in the instant case, where YU Zhen Dong and XU Chao Fan had precisely the same position in the Bank, were

alleged to have been involved in the same conspiracy for the same length of time, and where any dollar amounts concerned were equally known to the government at the time of YU's sentencing as they are now.

**Harshness of presentence confinement**

In United States v. Pressley, 345 F.3d 1205 (11th Cir. 2003), the Court of Appeal reversed the sentence, due to the District Court's incorrect belief that the Court was prohibited from giving a downward departure based on *[a six-year period of presentence confinement in 23-hour-a-day lockdown* .  The Circuit Court therefore remanded the case for the District Court to impose *"the two and a half year downward departure the district court said it would consider appropriate if it had the power so to depart."*

In United States v. Davoudi, 172 F.3d 1130 (9th Cir. 1999), the Court stated that, *"Davoudi correctly notes that the district court had the legal discretion to depart downward because deportable aliens may be unable to take advantage of the up to six months of home confinement authorized by 18 U.S.C. §3624©."*

**Cost of Incarceration**

In U.S. v. Angelos, 345 F.Supp.2d  1227 (D. Utah 2004), the Court departed downward based on the cost of holding the defendant in prison, stating:

> *Given that holding a person in federal prison costs about $23,000 per year, the 61-year-sentence the court is being asked to impose in this case will cost the taxpayers (even assuming Mr. Angelos receives good time credit and serves "only" 55-years) about $1,265,000. Spending more than a million dollars to incarcerate Mr. Angelos will prevent future crimes by him and may well deter some others from being involved with drugs and guns. But that money could also be spent on other law enforcement or social programs that in all likelihood would produce greater reductions in crime and victimization."*

24

In the instant case, the logic seems much more compelling.  Mr. XU has harmed no Americans with his actions, and if he someday faces charges in China for any crimes he is accused of, well, that is their concern, not ours.  It seems almost bizarre that the United States government should be charged with locking up a man whose crimes as charged and convicted have only a tangential connection to this country.

**Tail wagging the dog**

It certainly seems that this case is one where the tail of Mr. XU's involvement in this country is wagging the very large dog of the activities he is alleged to have committed in China.  This is similar to the situation in the case of U.S. v. Threadgill, 172 F.3d 357 (5th Cir. 1999).  In that pre-Booker case, the defendants were convicted of two offenses, illegal gambling, and money laundering.  Pursuant to USSG §2E3.1, the guideline level for the gambling convictions was 12, regardless of the amount of money involved.[13]  Based on the relevant conduct amount, the guideline for the money laundering convictions was 21.  The District Court departed downward from the much higher money laundering.  On appeal of the sentence by the government, the Fifth Circuit upheld the departure, and went so far as to say that they *"first found that the defendants'*

---

[13] Although not specifically cited in the opinion, §2E3.1(a) provides as follows:
*Gambling Offenses; Animal Fighting Offenses*
　　*Base Offense Level:(Apply the greatest)*
　　　　*(1)　　12, if the offense was (A) engaging in a gambling business; (B) transmission of wagering information; or (C) committed as part of, or to facilitate, a commercial gambling operation; or*
　　　　*(2)　　10, if the offense involved an animal fighting venture; or*
　　　　*(3)　　6, otherwise.*

*money laundering activities were incidental to the gambling operation. The court next found that the defendants' conduct was atypical because the defendants never used the laundered money to further other criminal activities. Based on those two factors, the district court departed downward under U.S.S.G. § 5K2.0. . . ."*

Respectfully submitted,

DATED this _7__ day of __April__, 2009

_____ /s/
                                        MITCHELL POSIN, ESQ.
                                        Counsel for Defendant
                                        XU Chao Fan