MARIO D. VALENCIA
Nevada Bar No. 6154
1055 Whitney Ranch Dr., Ste. 220
Henderson, NV 89014
T. (702) 940-2222
F. (702) 940-2220
*Counsel for Defendant Chaofan Xu*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>CHAOFAN XU, et al.<br><br>    Defendants. | No. 2:02-cr-00674-PMP-LRL<br><br>Defendant Chaofan Xu's<br>RESENTENCING POSITION and<br>MEMORANDUM OF POINTS<br>AND AUTHORITIES |

Defendant Chaofan Xu, through his attorney of record, Mario D. Valencia, hereby files his resentencing position for his coming resentencing hearing. Chaofan Xu's position is that he should be sentenced to 110 months, or time-served, in light of the Court of Appeal's decision and the other facts surrounding this case. The position is supported by the following memorandum of points and authorities.

Dated: December 20, 2013

Respectfully Submitted,

/s/ Mario D. Valencia
MARIO D. VALENCIA
*Counsel for Mr. Chaofan Xu*

# TABLE OF CONTENTS

I.     Introduction ................................................................................. 1

II.    The Sentencing Guidelines ............................................................ 2

       A.    The relevant Guidelines sections for the
             money laundering convictions .............................................. 3

       B.    Application of the money laundering Guidelines
             to facts of this case ........................................................... 4

             1.    As a matter of law, the Government cannot show a violation
                   of  18 U.S.C. § 1957 ................................................... 5

             2.    Factually the Government cannot show any violations of
                   18 U.S.C. § 1957 ........................................................ 6

       C.    Abuse of position of trust ..................................................... 34

       D.    The revised offense level and Guidelines
             sentence recommendation ..................................................... 35

III.   The 18 U.S.C. § 3553 Factors and the appropriate sentence ......... 35

IV.    Restitution .................................................................................. 41

       A.    The Bank of China is not a "victim" under the restitution statutes .... 42

       B.    The casino transactions were not "criminal conduct" ................ 43

V.     CONCLUSION ............................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 128 S.Ct. 586, (2007) ................................................................ 36

*Kimbrough v. United States*, 128 S.Ct. 558 (2007) ....................................................... 36

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) ............................................................ 38

*United State v. Truong*, 587 F.3d 1049 (2009) .............................................................. 39

*United States v. Alexander*, 106 F.3d 874 (9th Cir. 1997) ........................................ 6, 43

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ............................................... 2, 36

*United States v. Cote*, 51 F.3d 178 (9th Cir. 1995) ......................................................... 6

*United States v. Gonzalez*, 492 F.3d 1031 (9th Cir. 2007) ............................................. 7

*United States v. Harrison-Philpot*, 978 F.2d 1520 (9th Cir.1992) ................................. 8

*United States v. Johnson*, 249 F.3d 848 (2001) .............................................................. 8

*United States v. Restrepo*, 946 F.2d 654 (1991) .............................................................. 8

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003) ...................................................... 8

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) .......................................... 4, 5

*United States v. Xu*, 706 F.3d 965 (9th Cir. 2013) ........................... 1, 4, 5, 34, 35, 43

## Statutes

18 U.S.C. § 1956 ...................................................................................................... 4, 8, 38

18 U.S.C. § 2314 .................................................................................. 3, 8, 9, 34, 38, 42, 43

18 U.S.C. § 3553 .................................................................................... 35, 36, 37, 38, 41

18 U.S.C. § 3663 ...................................................................................................... 42, 43

18 U.S.C. § 3663A .................................................................................................. 42, 43

18 U.S.C. § 371 .......................................................................................................... 8, 38

## U.S. Sentencing Guidelines

USSG § 2B1.1 ............................................................................................................ 3, 4

USSG § 2S1.1 ..................................................................................... 1, 3

USSG § 2X1.1 .................................................................................... 3, 5

USSG § 3B1.1 ................................................................................... 8, 35

USSG § 3D1.1 ...................................................................................... 2

USSG § 3D1.2 ...................................................................................... 2

USSG § 3D1.4 ..................................................................................... 35

USSG § 3D1.5 ..................................................................................... 35

## Other Authorities

U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* (2009) ........ 37

U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* (2012) ........ 37

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   Introduction

The matter before this Court is the resentencing of Chaofan Xu ("Chaofan") and his codefendants Guojun Xu ("Guojun"), Wan Fang Kuang ("Kuang"), and Ying Yi Yu. This Court previously sentenced Chaofan to 25 years imprisonment, Guojun to 22 years, and Kuang and Ying Yi Yu to 8 years each.

Since that time, the legal landscape has changed significantly. Chaofan and the others appealed their convictions and sentences to the Court of Appeals for the Ninth Circuit. The Court of Appeals upheld the convictions, with one important wrinkle: while the RICO conspiracy conviction was left standing, the Court of Appeals held that it was only valid as it applied to the defendants' immigration violations. To the extent the RICO conspiracy conviction was based on criminal acts occurring outside the United States, it was an improper application of the RICO statute. *See United States v. Xu*, 706 F.3d 965, 974–79 (9th Cir. 2013).

The Court of Appeals also vacated Chaofan and his codefendants' sentences, including the restitution order. The key point on sentencing in the Court of Appeals' decision was that foreign criminal conduct is not properly considered as relevant conduct under the Sentencing Guidelines. *Id.* at 991–93. Because the defendants' foreign conduct was used to calculate the offense level for the money laundering part of the defendants' convictions, there was significant procedural error. The Court of Appeals directed that the defendants' Guideline Sentence be recalculated under USSG § 2S1.1(a)(2), without considering foreign conduct. *Id.*

Finally, on the matter of restitution, the Court of Appeals found that the restitution order was not supported by the necessary factual findings. The Court of

1

Appeals vacated the restitution order and directed that new findings be made to support any new restitution order entered.

## II.   The Sentencing Guidelines

The first issue this Court must determine is Chaofan's recommended sentence under the Guidelines. The Guidelines and the Guideline-dictated sentencing range "are the starting point and initial benchmark" of sentencing and should inform the whole sentencing process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted).

Fortunately, the Guidelines calculations need not start from scratch. The first-step determinations found in the PSR are still more-or-less correct. Under the grouping principles expressed in USSG §§ 3D1.1 & 3D1.2, Chaofan's convictions are placed into two groups. One is comprised of the immigration offenses, including the RICO conspiracy to commit those offenses. *PSR* at 16. The offense level calculations for this group was unaffected by the Court of Appeals ruling, and it remains at 19. *PSR* at 16–17.

The other group is comprised of the money laundering offenses. The situation in this group has changed significantly. First, as mentioned above, the Court of Appeals invalidated the RICO conspiracy conviction to the extent that it included money laundering crimes. Second, the Court of Appeals ruled that it was improper to consider foreign criminal conduct as relevant conduct under the Guidelines. These changes require the offense level for the laundering crimes group to be reconsidered completely.

**A.    The relevant Guidelines sections for the money laundering convictions**

Chaofan was found guilty of a conspiracy to violate 18 U.S.C. §§ 1957 and 2314. The corresponding Guideline for conspiracies is USSG § 2X1.1. The section instructs that the offense level for a conspiracy will be the same as the offense level "for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." *See* USSG § 2X1.1(a). The application notes contain an important restriction on "intended offense conduct." The application notes state "only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or actually occurred. Speculative specific offense characteristics will not be applied." USSG § 2X1.1 app. n.2.

The substantive offenses underlying the conspiracy are transportation of stolen moneys (18 U.S.C. § 2314) and engaging in monetary transactions (18 U.S.C. § 1957). The corresponding Guidelines for these offenses are USSG §§ 2B1.1 and 2S1.1 Because the latter will produce the higher ultimate offense level,[1] the offense level for the group of laundering offenses will be the offense level determined by USSG 2S1.1. *See* USSG § 3D1.3.

Per the Court of Appeals decision, the offense level under USSG § 2S1.1 must be determined using part (a)(2) of that section. That portion of the Guidelines states

---

[1] There are at least two reasons for the offense level to be higher under § 2S1.1. First, the applicable base offense level for § 2S1.1 is 8, while the base offense level for 2B1.1 is only 6. *See* USSG §§ 2S1.1(a)(2) & 2B1.1(a)(2). Second, the base offense level under both sections of the Guidelines is increased by the amount of money involved in the offense. *See* USSG §§ 2S1.1(a)(2) & 2B1.1(b)(1). Under the facts of this case, any violation of § 2314 will also be a violation of § 1957, but the reverse is not true.

that the offense level for a money laundering crime will be "8 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds." USSG § 2S1.1(a)(2). The guideline defines 'laundered funds' as "property, funds, or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956 or § 1957." USSG § 2S1.1 app. n.1. Or, expressed more clearly as it applies to this case, funds are only laundered if they are involved in a transaction that violates 18 U.S.C. § 1957.

A violation of § 1957 occurs if a person "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." *See* 18 U.S.C. § 1957(a). To prove a violation of § 1957, the government must trace the money involved in the transaction to criminal activity. *See Xu*, 706 F.3d at 980; *United States v. Rutgard*, 116 F.3d 1270, 1291–92 (9th Cir. 1997). There is also a jurisdictional limit built into the statute; relevant to this case, the offense must take place within the United States or be committed by a U.S. national or permanent resident. *See* 18 U.S.C. § 1957(d).

## B.   Application of the money laundering Guidelines to facts of this case

In light of this framework, the question now before the Court is this: what is the value of the "laundered funds," if any, and by what burden must that amount be shown. *See* USSG § 2S1.1(a)(2) & app. n.1.

The Government, the proponent of this sentencing factor, argues that value of the laundered funds for the purposes of this guideline is just over $20 million. *See Government's Resentencing Position* ("Government's Resentencing Memo"), CR #855 at 14–19. The basis for this figure is a series of transactions with casinos during gambling trips, as well as attempted wire transfers that occurred just before the

4

defendants left China. The Government claims that all of this money came from the Ever Joint Properties, and that all of Ever Joint's money, in turn, came from fraud on the Bank of China. The Government has presented no evidence that the defendants "specifically intended" any of the transactions to be a violation of § 1957; instead, it is including these transactions as violations of that statute that "actually occurred." *See* USSG § 2X1.1(a) & app. n.2.

As explained below, the Government cannot show that $20 million or even a much smaller amount was laundered in violation of § 1957. As a matter of law and as a matter of fact, the Government cannot connect the highlighted transactions to criminal activity.

      1.    *As a matter of law, the Government cannot show a violation of 18 U.S.C. § 1957*

One essential part of proving a violation of 18 U.S.C. § 1957 is tracing the money involved in the suspected transaction to criminal activity. *See Xu*, 706 F.3d at 980; *Rutgard*, 116 F.3d at 1291–92.

The Government cannot do that. It has previously conceded that it is "unable to trace the proceeds of the Bank of China fraud directly to the money brought into the United States." *Xu*, 706 F.3d at 980. The Court of Appeals, in its in-depth review of this case on appeal, concluded that "the government was unable to establish the tracing of funds necessary to establish guilt on those underlying offenses." *Id.* at 992; *accord id.* at 994. "At best, the government can show only that the 'vast majority' of the funds in Ever Joint accounts were fraudulently obtained." *Id.*; *accord Government Answering Brief before the Court of Appeals* at 60–62. Because the Court of Appeals considered and decided that the Government could not trace funds to establish violations of 18 U.S.C. §§ 1957 & 2314, it is the law of the case, and there is no reason to depart from it. *See United States v. Alexander*,

106 F.3d 874, 876 (9th Cir. 1997); *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995).

Beyond this tracing problem, the attempted wire transfers of almost $9 million suffer from another defect. Unless the transactions take place within the United States, or the defendant is a U.S. citizen or alien admitted for permanent residence or is simply in the United States at the time of the transaction, there is no violation of monetary transactions law. *See* 18 U.S.C. § 1957(a) & (d). The attempted wire transfers never reached the United States, so those transactions did not take place here. And the wire transfers were initiated while the defendants were still outside the United States and none of the defendants are U.S. citizens or aliens admitted for permanent residence. The attempted wire transfers do not meet the jurisdictional limit set by § 1957, and are therefore not violations of that law.

As a matter of law, the Government cannot prove that the transactions it presents are actually violations of § 1957. Therefore, there are no laundered funds to be counted under USSG § 2S1.1(a)(2), and the offense level for this conviction group should remain at 8.

2.      *Factually the Government cannot show any violations of 18 U.S.C. § 1957*

Even if the Government is able to overcome the law of the case, as a factual matter, it cannot show any violations of 18 U.S.C. § 1957. The Government's theory, in its essence, is that all the money involved in the transactions it presented is derived from Ever Joint, and that all of Ever Joint's money is the product of fraud on the Bank of China. Under examination, both parts of the Government's theory break down. Chaofan (and others) had alternative sources of income beyond Ever Joint, and Ever Joint had substantial, legitimate income.

*a. The Government's burden of proof*

If the Government is going to attempt to show substantive violations of the money laundering statutes, the first question to ask is what is its burden of proof in that endeavor.

As a general rule, the party seeking to adjust an offense level must establish by a preponderance of the evidence that the adjustment is merited. *United States v. Gonzalez*, 492 F.3d 1031, 1039 (9th Cir. 2007). If, however, a factor will have an extremely disproportionate effect on the Guidelines recommendation, the district court may need "to find that factor by clear and convincing evidence, rather than by a preponderance of the evidence." *Id*.

To determine whether a higher standard of proof is necessary, a court must look to the totality of the circumstances, with special attention paid to the following factors:

1. "Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment?"
2. "Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?"
3. "Do the facts offered in support of the enhancement create new offenses requiring separate punishment?"
4. "Is the increase in sentence based on the extent of a conspiracy?"
5. "Is the increase in the number of offense levels less than or equal to four?"
6. "Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?"

*Id*.

The purpose of requiring a higher standard of proof is "to ensure that a defendant's due process right to 'an accurate application of the Guidelines' is met."

7

*United States v. Johnson*, 249 F.3d 848, 857 (2001) (quoting *United States v. Restrepo*, 946 F.2d 654, 659 (1991)).

The Government is seeking a 22 point rise in the offense level. When added to the 8 point base under USSG § 2S1.1(a)(2), as well as role adjustment under USSG § 3B1.1, the Government's sought sentencing factor moves Chaofan's offense level to 34, which, with his criminal history of category I, means a recommended sentence of 151–188 months. After thorough consideration of the totality of the circumstances, and especially the factors listed above, the Government should be required to prove actual violations of the money laundering statutes by clear and convincing evidence.

The first factor above, whether the enhanced sentence is within the maximum sentence for the crime alleged in the indictment, weighs in favor of the heightened burden of proof. The maximum sentence for a conspiracy to violate 18 U.S.C. § 2314 is 5 years. *See* 18 U.S.C. §§ 371 & 2314. The maximum sentence for a conspiracy to violate 18 U.S.C. § 1957 is 10 years. *See* 18 U.S.C. §§ 1956(h) & 1957. To reach the low end of the recommended sentence, this Court must impose consecutive sentences on the two money laundering conspiracy convictions. To reach the high end of the recommend sentence, this Court must impose the maximum sentences on both money laundering conspiracies, run them consecutively, *and* impose a further consecutive sentence for one of the immigration violations.

The fourth factor, whether the increased sentence is based on the extent of a conspiracy, also weighs in favor of a heightened standard of proof. Under this factor, courts ask whether the factor depends on proving established criminal conduct is part of a conspiracy. *See e.g.*, *United States v. Riley*, 335 F.3d 919, 926–27 (9th Cir. 2003); *United States v. Harrison-Philpot*, 978 F.2d 1520, 1523-24 (9th Cir.1992). If that is the case, then a heightened standard of proof is usually not warranted. *Id.*

8

That is not the case here. The Government is not attempting to show that prohibited transactions were part of the conspiracy Chaofan was convicted of. Instead, the Government is trying to show that certain transactions were prohibited, that Chaofan and his codefendants violated 18 U.S.C. §§ 1957 or 2314 by using money linked to criminal activity. This is a difference in kind, and it warrants a heightened burden of proof.

The last two factors, whether the factor would increase the offense level more than 4 and whether the sentence recommended by the Guidelines more than doubles, both show that a heightened burden of proof is warranted. The Government is seeking a 22 level increase in the offense level. That would increase the recommended sentence for the money laundering convictions from 10–16 months at offense level 12 to 151–188 months at offense level 34 — more than a 10 fold increase. Even if measured from the offense level for the immigration crimes group, where the offense level is only 19 and the recommended sentence is 30–37 months, the recommended sentence is still 5 times bigger.

In light of the totality of the circumstances, and especially in light of the factors above, the Government should be required to prove by clear and convincing evidence that the transactions it has raised are violations of 18 U.S.C. §§ 1957 or 2314. More specifically, the Government should be required to show by clear and convincing evidence that the money involved in these transactions was linked to criminal activity.

### b. Chaofan had substantial wealth before the alleged conspiracy

The testimony and evidence at trial show that Chaofan "had some substantial wealth available to him *before* 1990." RT [8/20/08 a.m.] 77 (emphasis added). This is notable because the alleged conspiracy in this case was from "1991[] to on or about October 6, 2004." CR #151 at 4.

The evidence and testimony was as follows:

> Q.    And would that be the page that is A607/31?
>
> A.    Yes. Perhaps if I could just – perhaps I should very briefly describe the document. I think the jury has seen this document before, but it's a memo prepared by a UBS banker, Pauline Chung (phonetic), which discusses Mr. Xu Chao Fan. And I found it particularly relevant, if you go to A607/31, which is the third document but the second page in the memorandum, under the heading "building fortune," Ms. Chung has stated: "XCF" — the initials for Mr. Xu Chao Fan — "made his fortune in the late eighties by investing in residential and commercial properties, FX trading, and investment in Hong Kong stocks and IPO. The Hong Kong China trade business boom also created various opportunities for XCF to build up his wealth. *Estimated net worth over USD $30 million.*

RT [8/20/08] 73 (emphasis added). "FX" refers to foreign currency exchange, and "IPO" refers to initial public offerings, the initial listing of a company on a stock exchange. RT [8/20/08] 73–74. As for the "Hong Kong China trade business boom" that created various opportunities for Chaofan to build his wealth in the "late eighties," the testimony at trial explained it as follows:

> A. Well, I know from my work in Hong Kong from 1999 onwards that the *eighties* and nineties were a period through which the trade — trade product produced and sourced in China through Hong Kong — increased exponentially.

RT [8/20/08] 74 (emphasis added).

There also was a second bank that, like UBS bank, found through their investigation that Chaofan became quite wealthy in the late eighties. That trial evidence and testimony was:

> Q.    Now, next I'm going to show you a document that was marked in the upper right-hand corner as A307/48 and we have had marked now as Defense Exhibit 1123.

Do you recognize this document?

A.    Yes. It seems to be a — well, I think it's a form, a form I've seen before, that Standard Chartered Bank uses to record information with respect to their clients, and this one is in respect of Mr. Xu Chao Fan.

Q.    And was there anything of significance in that document?

A.    Yes. I thought it was significant because it was similar. It contained a phrase similar to what was in the UBS document. And by that I refer to, if you look about half way down the page, there is a subheading, "Explain the customer's source of wealth," and if you look three lines down, there is a sentence that says, "In 1989, after the 4th of June incidents," and —

MS. STONE:    Your Honor, we would object to the relevance of, I believe, what's going to be elicited about the 4th of June incident.

THE COURT:    All right.

Mr. Posin?

MR. POSIN:    Your Honor, I think it's relevant, not for anything to do with the 4th of June incident itself, but as it relates to the Hong Kong property values at that time. This was a period when, for various political reasons, there also ended up being economic opportunities, and what we're talking about is sources of potential money for these people, and I think it's inextricably —

THE COURT:    All right. I'll overrule the objection and allow the witness to continue with his testimony.

MR. POSIN:    Okay. I'm sorry; go ahead, Mr. Borelli.

THE WITNESS:  Thank you. I think I've missed the significance of all of that, but I'll —

MR. POSIN:    Okay.

THE WITNESS:  — I'll carry on.

11

The 4th of June was the Tiananmen Square massacre, and after that, for approximately two months after that, property prices in Hong Kong were severely affected. And three, four months after the massacre was — property prices rebounded pretty quickly, because there were — there was bargain hunting going on if I can put it that way. A lot of investors took advantage of the situation, pretty much as they did after the SARS outbreak in Hong Kong, to basically swoop on Hong Kong property and pick it up relatively cheaply and made some substantial gains in quite a short, short period of time.

Q.     And when you say "substantial gains in a short period of time," can you give us an example?

A.     Thirty to forty percent in under 12 months.

Q.     Okay. Is there anything else here that you think was of significance?

A.     No, it was really that sentence:  "In 1989, after the 4th of June incident, they did massive bargain huntings in Hong Kong properties, market, and made their initial first bucket of gold."

Q.     So, now, we just looked at two different documents from two different banks, and did those seem to correspond with each other?

A.     Yes; I think it shows two bankers that both seemed to understand that Mr. Xu Chao Fan had some substantial wealth available to him before 1990.

RT [8/20/08] 75–77.

     *c.   Chaofan also had other sources of income beyond Ever Joint or the Bank of China*

The testimony and evidence at trial also showed Chaofan had other sources of income, meaning income from sources other than Ever Joint Properties or Bank of China.

Yau Hip Trading Company (Yau Hip) was a trading company in Hong Kong. RT [8/20/08] 85–86. They traded "[p]lant equipment, motor vehicles, raw materials, raw materials in particular along the lines of chemicals in particular." RT [8/20/08] 86–87.

For example, Yau Hip imported raw materials and equipment for Kaiping Polyester Factory. RT [8/20/08] 88–89. The equipment came from Switzerland and the raw materials from Japan or Taiwan. RT [8/20/08] 89. Yau Hip was Kaiping Polyester Factory's "main and major" supplier. RT [8/20/08] 89–90. Kaiping Polyester Factory was a very large, government-owned company in China, one of the largest in that country. RT [8/20/08] 91–92. Every year it did about 2 billion renminbi in sales. RT [8/20/08] 90. Based on the annual 2 billion renminbi in sales, the testimony at trial was that, at a minimum, Yau Hip did "hundreds of millions of dollars" worth of business with Kaiping Polyester Factory every year. RT [8/20/08] 91.

The evidence and testimony at trial also showed the following about Yau Hip's profit and loss from the period of March 31, 1993 to December 31, 2000:

A.    I think if — Can you — Yeah, if we can leave it like that. I think paying particular attention to the sows line (phonetic) and the net profit or loss line, you can see that Yau Hip Trading Limited started as a relatively small business by comparison to where it ended up:  $47 and a half million dollars worth of sales. It grew year on year, but if you have a look at the net profit and loss line, it wasn't — it made losses the first three years, but if I could perhaps just ask you to track the sales along the top schedule and the bottom schedule, and then track the net profit and loss lines, you'll see that sales grew from $47 and a half million in 1993 to a billion Hong Kong dollars in 31 December 2000. And if you do the same exercise with the profit and loss, you see a loss — the number in the brackets — of $959,000 dollars for the year ended 31 December 1993.

13

There was a loss the following year in 1994. There was a loss in 1995. But thereafter, a profit every year through to 31 thousand — Excuse me — through 31 December 2000, and a profit of $40.9 million dollars in its last year.

Q.    And do you have a net cumulative profit that that reflects?

A.    That's what's on the second schedule. This is a comparison — sorry — this is a summary of all the numbers that were on the previous schedule. And you can see that over that period from 1993 to 2000, there was a total of $5.08 billion dollars worth of sales, which resulted in a cumulative net profit over that period of $106 million Hong Kong dollars, which is about $22 million U.S. dollars.

RT [8/20/08] 96–97.

Chaofan owned 90% of Yau Hip. RT [8/13/08] 237.

Like Yau Hip, there were many other companies and thus many other sources of income available to Chaofan. The testimony and evidence at trial was that there were "97 or 98 companies, depending on whether you include EJP," that Chaofan was involved with. RT [8/20/08] 99–100. The government's financial experts, however, were instructed to look into only seven of these companies. RT [8/13/08] 237; RT [8/20/08] 99–100.

### d. Ever Joint Properties was legally established and engaged in legitimate business dealings, so not all (or even most) of its money was money illegally obtained from Bank of China

Zhendong Yu ("Zhendong") testified that Ever Joint was a company that was "legally" set up ("established") in Hong Kong. RT [9/21/05] 191–92. It was established by the Bank of China's Kaiping branch. RT [9/21/05] 193, 206; RT [3/5/08] 544. Other Bank of China branches also opened up similar businesses in Hong Kong. RT [9/21/05] 193, 206; RT [3/5/08] 544. These businesses, like Ever

14

Joint, were set up to make a profit. RT [9/21/05] 193–94. Ever Joint's business activities in Hong Kong were legal. RT [9/21/05] 199, 206.

According to Zhendong, self-operating companies like Ever Joint could be established in China, but the business opportunities were much greater in Hong Kong. RT [3/5/08] 544–46. These better or greater business opportunities in Hong Kong included a real estate market that was much more active than the one in China, import/export trading-type activities that provided more representatives and more foreign contacts, and investment opportunities in a stock market that was more open and offered stocks that weren't available in China, so there was much more opportunity to make money in Hong Kong. RT [3/5/08] 545–49.

There is no question Ever Joint used some money from the Bank of China to conduct its business activities in Hong Kong. Some of that money from the Bank of China was inappropriately provided to Ever Joint, according to Zhendong, because the amount provided exceeded his authorization limits pursuant to Bank of China policies and procedures. RT [9/21/05] 204, 206–08. And, some of the money from the Bank of China, again according to Zhendong, was provided to Ever Joint through "illegal" means. RT [2/19/08] 51–59.

That said, there is also no question that not every penny (or even most) of Ever Joint's money or funds were monies that were illegally obtained from Bank of China. The testimony and evidence at trial shows that Ever Joint went "into the open market and developed loans with established banks." RT [8/13/08] 225. For example, Ever Joint borrowed millions from Hua Chiao Bank, millions from Sin Hua Bank, millions from ING bank, millions from ING Barings Bank, and they borrowed money from Bank of China Guangdong. RT [8/13/08] 210–11, 225, 232–33.

Ever Joint obtained these monies legally and paid the banks interest on the loans, including the Bank of China.[2]  RT [8/13/08] 218–20.

Ever Joint also borrowed millions of dollars from Chaofan personally, and from the company directors as a whole. RT [8/13/08] 228–30. To be exact, the government's financial expert testified Ever Joint borrowed about $171 million Hong Kong from Chaofan and the directors. RT [8/13/08] 228. Moreover, Chaofan agreed in writing in some financial documents not to demand Ever Joint repay him the money he lent them. RT [8/13/08] 228–30.

Ever Joint also was involved in legal business activities or operations to make a profit, and it did. The evidence and testimony at trial showed that Ever Joint bought and sold real estate properties, rented other properties and units, bought and sold stocks, bought and sold shares in banks and other companies, lent money to other companies for business projects, and engaged in other legal business activities. RT [9/21/05] 193, 196;  RT [2/19/08] 43–51;  RT [3/5/08] 559–61;  RT [8/13/08] 210–11, 220–33.

---

[2] The testimony and evidence at trial was that Ever Joint paid interest to these commercial banks. RT [8/13/08] 219–20. There was a question, however, about whether Ever Joint paid interest to Bank of China Kaiping, not Guangdong. *Id.* According to the government's financial expert, Ever Joint issued a demand draft to Bank of China Kaiping for $56 million Hong Kong for interest. *Id.* The demand draft was cashed. *Id.* The government's expert was then asked:

> Q.  Yeah. Okay. So you didn't go to Kaiping to make sure that they got every cent of their interest, but that's certainly the way it looks from what you've seen so far, right?

> A.  That would be the appearance. Yes.

RT [8/13/08] 220. This raises an important question: who pays $56 million in interest for money that's stolen or illegally obtained? RT [8/13/08] 218. Clearly not all of the money Ever Joint got from Bank of China was stolen or illegally obtained.

16

Ever Joint made money from its legal business activities or operations. As a matter of fact, the government's financial expert testified about how much cash — not other assets, investments, properties, etc. — went through Ever Joint "as a result of its validated operations." RT [8/13/08] 207–08. According to the government's expert, Ever Joint earned $134 million from its valid business operations in 1993, $195.8 million in 1994 (that same year Ever Joint's listed investments went from $13 million to $67 million and it bought 700,000 shares in HSBC bank in Hong Kong), $162 million in 1995 (that year Ever Joint sold its 700,000 shares in HSBC and made $8.7 million from the sale), $85 million in 1996, $162 million in 1997, $97 million in 1998, and $96 million in 1999. RT [8/13/08] 207–11, 221–33.

Clearly, as the evidence and testimony show, not all (or even most) of Ever Joint's funds were illegally obtained from Bank of China.

> e.  *Most of the transactions do not link to Ever Joint, and none link to illegal proceeds*

The Government points to 19 different transactions in the trial record to support its claim that the offense level should be adjusted to account for over $20 million in laundered funds. But when those transactions are examined one by one, few link to Ever Joint, and none link to illegal proceeds from the Bank of China (or elsewhere).

> i.  Transaction 1

| 3-2-1999 | Caesars Palace | $493,083.87 | Ex. 181(7), BOC 14819 |

Exhibit 181(7) shows that this trip to Caesars Palace Las Vegas was February 16, 17, or 18, 1999. The first page of Exhibit 181(7) [BOC 15136] shows

17

that the money (credit) used to gamble was given to Cheong Kin Wa. Cheong is not a member of the alleged conspiracy in this case. He is not a co-defendant. He is not Chaofan's agent. Cheong was actually one of Chaofan's clients. Cheong invited Chaofan and the other individuals listed on the first page of Exhibit 181(7) [BOC 15136] to Las Vegas to gamble. These other individuals include Guojun, Cheong Kin Wa, Zhendong, Zhou Feng. Exhibit 181(7) does not show where the money (credit) given to Cheong and that was used to gamble came from. It shows that they lost money gambling on this trip and owed Caesars Palace some money. That is where the second page of Exhibit 181(7) [BOC 14819] comes into play. To pay for the loss — the gambling debt — a cashier's check from Bank of China Macau Branch was sent to Caesars Palace. The cashier's check was issued on March 2, 1999, and Caesars Palace received it on March 5, 1999. Ex. 181(7) [BOC 14819]. The allowance receipt was signed by Wong Weng In and the check was deposited in Bank of America Macau into account number 506-004-1670-06. It seems therefore that this money (cashier's check) never even came to the United States.

Regardless, the exhibit does not show that the cashier's check was requested, purchased, obtained, and sent by Chaofan or Ever Joint. Furthermore, it does not show that the cashier's check was purchased with illegal proceeds (*i.e.*, the money allegedly stolen from the Bank of China). There was no evidence or testimony presented at trial, or now in the government's sentencing memorandums, tracing this cashier's check to illegal proceeds.

ii.  Transaction 2

| 9-29-2000 | Bellagio | $279,000.00 | Ex. 180(3), BOC 15080 |

Exhibit 180(3) [BOC 15080] shows copies of two checks. This $279,000 refers to the top check on that page. It is a check from First Bank in Australia (Westpac Banking Corporation, International Accounting Sydney). The check is made out to Wong Hon Chee for $500,000 Australian dollars (AUD). Wong Hon Chee is not an alleged member of the conspiracy, nor is he a codefendant in this case.

There is no evidence or testimony to show that this check that came from Australia and was made out to Wong Hon Chee came from Chaofan or Ever Joint. On the contrary, the testimony at trial was this money could not be traced to Ever Joint Properties. RT [8/11/08] 113–16. Moreover, there is no evidence or testimony tracing this check and Australian dollars to illegal proceeds from the Bank of China or elsewhere.

iii. Transactions 3 & 4

| 9-30-2000 | Bellagio | $500,000.00 | Ex. 180(3), BOC 15080;  Ex. 180(5), BOC 15078;  RT [8/12/08 p.m.] 242–43;  RT [8/12/08 p.m.] 247–48; Ex. 244, Appendix XVIII.8 |
| 9-30-2000 | Bellagio | $1,921,721.88 | Ex. 180(2), BOC 15064; RT [8/12/08 p.m.] 246–47. |

The check at the bottom of Exhibit 180(3) [BOC 15080] and the check on Exhibit 180(5) [BOC 15078] are copies of the same check. The check is from Hua Chiao Commercial Bank Limited and it is made out to Wong Hon Chee for $600,000, not $500,000 as the government mistakenly put in its sentencing memorandum. CR #855 at 14. This is also verified by Exhibit 244 (Appendix

19

XVIII.8) at 1. The check was made out on September 30, 2000. It is check number 50009484.

Exhibit 180(2) [BOC 15064] is a document with copies of four checks. All four checks are from Hua Chiao Commercial Bank Limited in Hong Kong. They are all made out to Kwong Wa Po on September 30, 2000. Three of the checks were for $627,782.48 each, and one of the checks is for $38,434.44. The check numbers are 50009485 through 50009488.

According to the government's financial expert, the funding for these five checks was Ever Joint Properties. RT [8/12/08 p.m.] 246-248. The money was requested by Chaofan as a loan to Kwong Wa Po. *Id.* The money was then deposited into Kwong Wa Po's account and then the cashier checks were issued. *Id.*

A point the government has failed to raise, however, is that the evidence and testimony at trial shows that the money came from Ever Joint's "overdraft" account at Hua Chiao Bank. RT [8/20/08 p.m.] 259. In other words, it was money Ever Joint "borrowed" from Hua Chiao Bank. *Id.*

These five checks, checks 50009484 through 50009488, were not monies stolen from the Bank of China. There was no evidence or testimony presented to trace the money to illegal proceeds.

iv. Transactions 5 & 6

| 4-27-2001 | Caesars Palace | $450,000.00 | Ex. 181(21), BOC 14888 |
|---|---|---|---|
| 4-27-2001 | Caesars Palace | $450,000.00 | Ex. 181(21), BOC 14895[3] |

---

[3] This page citation is incorrectly listed in the government's sentencing memorandum as BOC 14888. BOC 14888 is the $450,000 check from Shanghai Commercial Bank. BOC 14895 is the $450,000 check from Hang Seng Bank listed on page 15 of the government's sentencing memo.

These two checks — one from Shanghai Commercial Bank and one from Hang Seng Bank — are made out to Chan Tsang Wai. Chan Tsang Wai is not a co-conspirator, co-defendant, or even an alleged agent of Chaofan. The credit for these checks, thereby allowing him to gamble, was given to Chan Tsang Wai. Ex. 181(21) [BOC 15141]. There is no evidence or testimony tracing this money back to Chaofan, Ever Joint, or the Bank of China. More importantly, there is no evidence or testimony tracing these checks to illegal proceeds.

   v.  Transaction 7

| 5-7-2001 | Caesars Palace | $1,000,000.00 | Ex. 181(21), BOC 14895 |

The exhibit cited by the government is nothing more than a copy of a check — check #998 specifically. The government has not provided any evidence or testimony tracing this money to Ever Joint or the Bank of China. More importantly, there is no evidence or testimony tracing this money to illegal proceeds (i.e., the money stolen from the Bank of China).

There was evidence and testimony presented at trial, however, that shows where this $1,000,000 came from. Referring to Defense Exhibit 1118, Mr. Borrelli testified:

> Q.   But, meanwhile, would you go through with us please, this document?
>
> A.   Yes. It shows that the million dollars that was used to write the check from the account to Caesar's Palace, the Bank of America account from which that check was written had a zero balance on the 10th of May, 2001, that they received a million dollars, and the notation on the statement is that million dollars was, I think the term is, it says "swept" from a brokerage account. We can't tell which brokerage account or

21

> where that brokerage account is held. That million dollars goes into the Bank of America account, and then from that Bank of America account is written a million-dollar check to Caesar's Palace.

RT [8/20/08 a.m.] 65–67.

He was then shown Defense Exhibit 1119, and Mr. Borrelli testified as follows:

> Q.    And if we could look at the section that's marked "your account at a glance," or, well, actually, let's first go to the "money manager additions and subtractions."
>
> Is there something that you note there?
>
> A.    That's the note I made for what I mentioned previously. You can see on the 10th of May a million dollars enters that account, and the transaction details are "swept from a brokerage." It gives a balance to the account that day of a million dollars. And also on that day someone has drawn a check number 998, or a check is drawn on that account, check number 998, for a million dollars.
>
> Q.    Okay. Then if we can if we can go — let's go back up to the section that says "your account at a glance."
>
> Do you see that section?
>
> A.    Yes, sir.
>
> Q.    And does that give a beginning balance of May 5th, '01 — I'm sorry — May 1st, '01?
>
> A.    Yes, sir. It shows a beginning balance of zero, and then it repeats the deposit of the check in there.
>
> Q.    And how much is the deposit?
>
> A.    It's a million dollars.
>
> Q.    And then there was a single check posted during that period?
>
> A.    Yes, for a million dollars.

22

Q.   A million dollars.

So, does that indicate to you that that account started with a million dollars on —

A.   Well, it started with zero.

Q.   I'm sorry. It started with zero dollars; that there were two transactions during the relevant period; and what were those transactions?

A.   A million dollars came in and a million dollars went out.

Q.   And the million dollars that came in came from where?

A.   It came from a — it says brokerage account.

Q.   Are there any documents that were provided as part of Government's discovery that show what brokerage account that was or any further information about that brokerage account?

A.   No, sir.

RT [8/20/08 a.m.] 67–69.

Mr. Borrelli was then show Defense Exhibits 1120 and 1121 that once again are documents showing a zero balance at Bank of America, a million dollars coming in from the brokerage account, and a million dollars going out in the form of a check (check 998) to Caesar's Palace. RT [8/20/08 a.m.] 69–71. Mr. Borrelli then testified:

Q.   And, so, then, showing you this summary of accounts, a summary chart of the account, would you again explain what you were looking at in those transactions and what that shows?

A.   The transaction — I think what this shows is that — I haven't been able to find any documents in the discovery that indicate that this million dollars that went to Caesar's Palace came from either EJP or BOC Kaiping.

Q.   And why is that?

23

> A.    Because it came from a brokerage account, went into
> Bank of America account, and came out of a Bank of America
> account. We can't see anything else.
>
> Q.    And we don't know where that brokerage account was
> or what was in it or anything else, right?
>
> A.    Correct.

RT [8/20/08 a.m.] 71.

### vi. Additional information showing the money above is not illegal proceeds

Chaofan, Guojun, Kuang, Ying Yi Yu, Wa Po Kwong, and Wong Hon Chee came to Las Vegas, NV in October 2000 and gambled at the Bellagio. They presented the Bellagio with: (1) four cashier's checks made out to Kwong Wa Po (Ex. 180(2), BOC 15064), (2) one cashier's check made out to Wong Hon Chee (Ex. 180(5), BOC 15078), (3) an Australian dollars check made out to Wong Hon Chee (Ex. 180(3), BOC 15080), and (4) some Caesars Palace checks. RT [8/11/08] 113-118, 121.

The five cashier's checks — (Ex. 180(2), BOC 15064 and Ex. 180(5), BOC 15078) — came from Ever Joint's "overdraft" account at Hua Chiao Bank in Hong Kong; it was borrowed money. RT [8/20/08 p.m.] 259. The Australian dollars check (Ex. 180(3), BOC 15080) was made to Wong Hon Chee and could not be traced back to Chaofan, Ever Joint, or Bank of China. RT [8/11/08] 113–16. The Caesars Palace checks were verified checks from Caesars Palace in Las Vegas to some of these defendants (patrons). RT [8/11/08] 117, 127.

This was the money defendants used to gamble at the Bellagio in October 2000. RT [8/11/08] 115. The Bellagio deposited the Caesars Palace checks. RT [8/11/08] 120, 132. The patron to whom the Caesars Palace check is issued then has that amount of money to gamble with at the Bellagio. RT [8/11/08] 124–25. The Bellagio did not (and does not) deposit the cashier's checks. RT [8/11/08] 132. They

24

simply hold them until the end of the trip. RT [8/11/08] 120. The Bellagio then sets up a "front money account" or "customer deposit withdrawal" account based on the cashier's checks. RT [8/11/08] 113, 134. This is different than a "credit line." A "credit line," according to the Bellagio, is where the patron is "using our money to play against and you have nothing up for security." RT [8/11/08] 133. "In this instance these patrons [meaning defendants] put these checks up as security to play against." *Id.* That's not the case with a foreign item check, such as the Australian dollar check. RT [8/11/08] 113. The Bellagio did set up a "credit line" based on the Australian dollar check. RT [8/11/08] 113, 134.

At the end of the trip, the customers "settle up." RT [8/11/08] 116. If they're winners, the Bellagio returns the checks to the customers they put up for front money (security). *Id.* The Bellagio would also give them a Bellagio check, cash, wire transfer funds for their winnings. *Id.*

On this trip, the October 2000 trip, there "was no loss whatsoever so all of the checks were returned to all of the patrons." RT [8/11/08] 132. In addition to returning all of the checks to the patrons (defendants), the Bellagio also gave defendants some Bellagio checks for their winnings, or wired money to their accounts. RT [8/11/08] 118–22; Ex. 180(6).

In the case of Chaofan (Yat Fai Hui), the Bellagio wired $1,800,000 to his Bank of America account in Las Vegas, NV at the end of this trip. RT [8/11/08] 121, 130-132; Ex. 180(6) [BOC 14099]. This $1,800,000 consisted of Chaofan's original deposit at the Bellagio, which was a Caesars Palace check for $1,100,000, and chips that were verified winnings from this trip. *Id.* This money therefore did not come from Ever Joint or the Bank of China. It did not consist of illegal proceeds (i.e., the money stolen from the Bank of China).

Although the Bellagio employee who testified at trial for the government could not say where the money went after it was wired to the Bank of America account, the defendants' financial expert was able to trace the money after that.

Mr. Borrelli testified that after the $1.8 million was wired to the Bank of America account, it was transferred to a "brokerage account" in late November 2000. RT [8/20/08 p.m.] 256–61. The money then came out of that "brokerage account" on May 10, 2001. *Id.* This is important because, based on the other evidence and testimony presented at trial, it's possible (even probable) the $1,000,000 check Chaofan wrote to Caesars Palace on May 7, 2001 from his Bank of America account that was traced back to a "brokerage account," was from the Caesars Palace money and Bellagio winnings in October 2000 (*i.e.*, the $1.8 million Chaofan had the Bellagio wire to his Bank of America account that then went into a brokerage account).

vii. Transaction 8

| 5-23-2001 | Caesars Palace | $420,000.00 | Ex. 181(21), BOC 15141 |

Exhibit 181(21) [BOC 15141] is a chart, presumably from Caesars Palace. Other than that, we don't know anything about this chart, and the government has not cited to any trial testimony about the chart (e.g., who put it together, is it a business document, what information was used to put the chart together, etc.). One of the entries on this chart simply states: "5/23/01 Hong Kong Transmittal." There is no other information about the transmittal. The government has failed to trace this $420,000 to Chaofan, Ever Joint, or the Bank of China. And by the same token, it has failed to show that this money is illegal proceeds of any crime.

viii.    Transaction 9

| 9-28-2001 | Caesars Palace | $1,000,000.00 | Ex. 181(22), BOC 14901 |

Ex. 181(22) [BOC 14901] is a deposit slip, showing that $1,000,000 (actually $996,250) was deposited into Desert Palace's bank account in Hong Kong. This is verified by Ex. 181(22) [BOC 15140].

The $1,000,000 deposited into Desert Palace's Bank of America account in Hong Kong came from Yat Fai Hui (Chaofan). There is no evidence or testimony, however, tracing the money to Ever Joint or the Bank of China. More importantly, there is no evidence or testimony tracing the money to illegal proceeds.

ix. Transactions 10, 11, & 12

| 10-6-2001 | Caesars Palace | $500,000.00 | Ex. 181(22), BOC 14490 |
| 10-6-2001 | Caesars Palace | $500,000.00 | Ex. 181(22), BOC 14490 |
| 10-6-2001 | Caesars Palace | $300,000.00 | Ex. 181(22), BOC 14490 |

Exhibit 181(22) [BOC 14490) is a one page sheet titled "Credit Account Run Down." It is for an account belonging to Yat Fai Hui (Chaofan). There is no supporting documentation for this document, and all it says is:

> 3 bank drafts 2 drawn on Standard Chartered Bank Hong
> Kong pay thru Standard Chartered Bank NY 500k and 500k
> another 300,000 bank draft drawn on Hua Chiao Commercial
> Bank Ldt pay thru Bank of America NY

There is no evidence or testimony that the money came from Ever Joint or the Bank of China. More importantly, there is no evidence or testimony tracing this money to illegal proceeds, like money stolen from the Bank of China.

27

x.  Transaction 13

| 10-15-2001 | Desert Palace (Caesars Palace and Paris) | $1,141,661.34 | Ex. 181(23); Ex. 244 (Appendix XVI.9; RT [8/12/08 p.m.] 243–46) |
|---|---|---|---|

The evidence and testimony cited by the Government shows that this was money that came out of Zhendong's account. RT [8/12/08 p.m.] 243–44. The Government then asked its financial expert:

> Q.  And in your analysis of Yu Zhendong's account were those accounts funded **in part** by funds from EKC[4] (phonetic)?
>
> A.  Yes.

RT [8/12/08 p.m.] 244 (emphasis added).

Again, the evidence and testimony at trial did not trace this money — the money referred to in these exhibits (Ex. 181(23), Ex. 244) — to Chaofan, Ever Joint, or the Bank of China. At most, the testimony was that Zhendong's "accounts" were funded "in part" by Ever Joint. In other words, there was money in these accounts that did not come from Ever Joint. Moreover, Zhendong had "accounts," — meaning more than one account — and we are not told if all of his accounts had Ever Joint funds, or only some of his accounts. Furthermore, there is no evidence on what account this money came from, and if it was indeed money from Ever Joint that was involved in this transaction.

Finally, once again, there is no evidence or testimony tracing this money to illegal proceeds

---

[4] This is really a reference to EJP, Ever Joint Properties.

28

xi. Transaction 14, 15, 16, & 17

| 10-15-2001 | Desert Palace | $5,636,387.50 | Ex. 181(23);  Ex. 244 (Appendix XVII.31);[5] RT [8/12/08 p.m.] 243–46 |
| 10-15-2001 | Desert Palace | $173,891.75 | Ex. 181(23);  Ex. 244 (Appendix XV.27);[6] RT [8/12/08 p.m.] 243–46 |
| 10-15-2001 | Desert Palace | $1,675,257.73 | Ex. 181(23);  Ex. 244 (Appendix XV.26);[7] RT [8/12/08 p.m.] 243–46 |
| 10-15-2001 | Desert Palace | $105,069.97 | Ex. 181(23);  Ex. 244 (Appendix XV.26);[8] RT [8/12/08 p.m.] 243–46 |

The exhibits and testimony cited by the government do not show the monies involved in these transactions came from Ever Joint or the Bank of China. As for transaction #14 ($5,636,387.50), this was money that came out of Guojun's account. The government's financial expert, when asked about this transaction and Guo Jun's account, did not say anything about the money coming from Ever Joint or the Bank of China. RT [8/12/08 p.m.] 244–45. And again, there is no evidence or testimony tracing this money to illegal proceeds.

The same is true about transaction #15 ($173,891.75). The money came out of a joint account for Chaofan and Guojun. There is no evidence or testimony that the money came from Ever Joint or the Bank of China. The government's financial

[5] The Government incorrectly cites to Exhibit 244 (Appendix XVI.9), a document referring to Zhendong, not Guojun. Exhibit 244 (Appendix XVII.31) is the document that references Guojun.

[6] The Government incorrectly cites to Exhibit 244 (Appendix XVI.9), a document referring to Zhendong, not Guojun. Exhibit 244 (Appendix XV.27) is the document that references Guojun.

[7] The Government incorrectly cites to Exhibit 244 (Appendix XVI.9), a document referring to Zhendong, not Guojun. Exhibit 244 (Appendix XV.26) is the document that references Guojun.

[8] The Government incorrectly cites to Exhibit 244 (Appendix XVI.9), a document referring to Zhendong, not Guojun. Exhibit 244 (Appendix XV.26) is the document that references Guojun.

expert, when asked about this transaction and the joint account, did not say anything about the money coming from those sources. RT [8/12/08 p.m.] 245. And again, there is no evidence or testimony tracing this money to illegal proceeds.

The last two transactions listed above (#16 and #17) were monies from Chaofan's account. Again, there is no evidence tracing the money in these transactions to Ever Joint or the Bank of China. The government's financial expert did not testify specifically about these transactions. Instead, he testified in general about Ex. 244 (Appendix XV.26), which is a two-page schedule listing several remittances from Chaofan to casinos around the world, including Malaysia, Macau, Australia, and Desert Palace in Hong Kong (not in the United States). RT [8/12/08 p.m.] 245–46. These remittances, meaning all of the remittances listed in Ex. 244 (Appendix XV.26), came from Chaofan's "accounts." RT [8/12/08 p.m.] 246. These "accounts" were funded "in part" by funds from Ever Joint, according to the government's expert, but he did not say which accounts or how much was funded by Ever Joint. *Id*. More specifically, he did not testify that the monies used in these two transactions (#16 and #17) were funds from Ever Joint or the Bank of China.

The defense's expert testified the money for transaction #16 came out of Chaofan's "share trading account — or savings account" at ING Bank in Hong Kong. RT [8/20/08 p.m.] 157–59. The money for transaction #17 came out of "some account" at Fortis Bank belonging to Chaofan. RT [8/20/08 p.m.] 159–60. There is no evidence, however, tracing this money to Ever Joint or the Bank of China. RT [8/20/08 p.m.] 156-157, 160, 162-63.

As a matter of fact, there is no evidence or testimony that shows that any of the money involved in these remittances were funds from Ever Joint or the Bank of China. RT [8/20/08 p.m.] 156–63. More importantly, there is no evidence or testimony tracing this money to illegal proceeds.

In fact, the evidence and testimony at trial was that Chaofan and Guojun had many other sources of income, other than Ever Joint or the Bank of China, to provide this funding. RT [8/20/08 a.m.] 131. The evidence also showed that the money involved in these remittances (#14 through #17) was deposited into Desert Palace's bank account at Bank of America in Hong Kong, and that none of this money ever made it into the United States. RT [8/20/08 p.m.] 156–63.

xii. Transactions 18 & 19

| | | | |
|---|---|---|---|
| 10-15-2001 | Zhen Feng Yu | $1,553,000.00 | (Ex. 17; RT [8/19/08 a.m.] 111–12) |
| 10-15-2001 | Zhen Feng Yu | $2,000,000.00 | (Ex. 17; RT [8/19/08 a.m.] 111–12) |

The exhibit and testimony cited by the government show a request from Zhendong to wire the money in these two transactions to his brother Zhen Feng Yu in San Francisco, CA on or about October 15, 2001. Other than that, the exhibit and testimony don't tell us anything about the money. There is no evidence or testimony tracing this money to Ever Joint or the Bank of China. More importantly, there is no evidence or testimony tracing this money to illegal proceeds.

The government may try to bolster their claim that this money is the proceeds of illegal activity by pointing to Zhendong's deposition testimony, which they cite in their sentencing memorandum. *See Government's Resentencing Memo*, CR #855 at 17 (citing RT [9/20/05] 120–21). However, as the following portion of this memorandum explains, that claim fails.

31

    *f.   Zhendong never said "all" of the money Chaofan, Guojun, and him had in Hong Kong was money embezzled from Bank of China.*

Contrary to the government's claims, Zhendong did not testify that "the money Chaofan, Guojun, and Zhendong had in Hong Kong were *all* from the funds embezzled from BOC." *Government's Resentencing Memo*, CR #855 at 17 (emphasis added). Zhendong's testimony cited by the government is as follows:

> Q.    You said that you had discussions about what do with the money in Hong Kong.
>
>     My question is how much money was in Hong Kong that you were discussing?
>
> A.    Just for *myself*, *I* had a few million U.S. dollars.
>
> Q.    And — go ahead.
>
> A.    Xu Guo Jun and Xu Chao Fan also had money in Hong Kong, *but I do not know precisely how much*.
>
> Q.    And this money in Hong Kong, did that money come from the Bank of China?
>
> A.    Could you repeat the question again?
>
> Q.    The money that you just described, *your* few million dollars that *you* had in Hong Kong, did *that* money originate from the Bank of China?
>
> A.    I explained where this money come from before. These are the money come from *my monthly compensation from the company <u>I</u> owned. Also from the bonus I received*.
>
> Q.    And *that* company, and *your* bonuses, were they *connected to* the money that you said you and the two others embezzled from the Bank of China?
>
> A.    Yes.

RT [9/20/05] 120–121 (emphasis added).

As this exchange shows, Zhendong did not testify that "all" the money Chaofan, Guojun and him had in Hong Kong were "funds embezzled from the BOC."

32

Zhendong testified he did not know how much money Chaofan and Guojun had in Hong Kong, and he did not testify about where Chaofan's and Guojun's money came from. Zhendong testified only about his "few million" dollars in Hong Kong. When asked if "that" money "originated" from the Bank of China, Zhendong said it came from a company he personally owned in Hong Kong, it was from his "monthly compensation" and "bonuses," not from the Bank of China.

He then was asked if *his* company, compensation, and bonuses were "connected to" the money embezzled from the Bank of China. Zhendong responded yes. The fact that Zhendong's company and money are "connected to" the money he claims was embezzled from Bank of China is not the same thing as saying these funds *are* the money embezzled from the Bank of China. It certainly is not evidence that "all" of Chaofan's, Guojun's, and Zhendong's funds in Hong Kong *were* the monies embezzled from BOC.

> g.  *Conclusion*

The point of this lengthy discussion is to show that the financial picture that the Government is painting is a far cry from reality. There is no iron-link chain that leads from Las Vegas through Hong Kong to Kaiping.

The Government wants this Court to believe that Chaofan was a lowly government worker who lived the life of a high-roller by scamming the bank he worked for. But that glosses over so many details, it makes Chaofan look like a cartoon villain.

The truth is much more complex. Chaofan was a successful businessman who made large amounts of money. He owned and managed thriving businesses beyond Ever Joint. And Ever Joint was far from the shell company the Government describes. According to the Government's own expert, it had significant, *legitimate* financial success.

The Court of Appeals has already recognized that the Government cannot trace any transactions to illegal proceeds as required by the statutes. Ignoring that reality, the Government has presented 19 separate transactions that it claims are instances of money laundering. But when you dig into the gritty details, and look at what the witnesses said — in full, not out of context — it soon becomes clear that the Government's only criteria for declaring a money laundering violation is a transaction in the United States. That is not what the law demands.

The details refute the Government's attempts at tracing. As a matter of fact, as well as a matter of law, the Government cannot prove any substantive violations of money laundering statutes 18 U.S.C. §§ 1957 & 2314. Without any provable violations, whether by a preponderance or clear and convincing evidence, "laundered funds" under USSG § 2S1.1(a)(2) must remain zero. The offense level for the money laundering group of convictions does not move; it remains at 8.

## C.    Abuse of position of trust

USSG § 3B1.3 directs a court to increase a defendant's offense level by 2 if "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." When Chaofan was originally sentenced, his offense level for the money laundering crimes was increased by 2 levels for abusing his position as "president of the Kaiping Sub-Branch of the Bank of China." *PSR* at 15. After the Court of Appeal decision, this offense level increase can no longer be applied.

First, the Court of Appeals vacated the RICO conspiracy as it concerned extraterritorial activity, including fraud on the Bank of China. *Xu*, 706 F.3d at 974–79. Second, the Court of Appeals ruled that it was improper to consider foreign criminal conduct as relevant conduct under the Sentencing Guidelines. *Xu*, 706 F.3d at 991–93. Such conduct is "too attenuated to be considered when calculating a base

34

offense level." *Id.* at 992. Both of these actions push Chaofan's role as president of the Kaiping Sub-Branch outside of the bounds of relevant conduct. Consequently, this adjustment can no longer be applied.

**D.   The revised offense level and Guidelines sentence recommendation**

Without the unfounded "laundered funds" and the now impossible abuse of trust adjustment, Chaofan's offense level for the money laundering conviction group looks like this:

| | |
|---|---|
| Base offense level for money laundering convictions under USSG § 2S1.1(a)(2) | 8 |
| Adjustment for laundered funds under USSG § 2S1.1(a)(2) | 0 |
| Role adjustment under USSG § 3B1.1 | 4 |
| **Total offense level** | **12** |

Because the offense level for the immigration crimes is higher — it is 19 — it will be used as Chaofan's offense level for sentencing. *See* USSG §§ 3D1.4 & 3D1.5. Chaofan has 0 criminal history points, for a criminal history category of I. *See PSR* at 17. With these figures, the Sentencing Guidelines recommend a sentence of 30 to 37 months.

## III.   The 18 U.S.C. § 3553 Factors and the appropriate sentence

The driving force when Chaofan was last sentenced was the enormous loss at the Bank of China. The over $400 million loss pushed up Chaofan's offense level

and recommended sentence to the stratosphere — a life sentence under the Guidelines. *See PSR* at 20. Probation recommended a 65-year sentence, the maximum allowable for the crimes of conviction, and the Government pushed that sentence, too. *See id.* at 22–23; *Sentencing Transcript, Day 1*, CR #815 at 233. But after considering the sentences imposed by other courts where the losses were of similar magnitude, this Court departed *downward* from the Guidelines recommendation and imposed a sentence of 300 months — 25 years — on Chaofan. *See Sentencing Transcript, Day 2*, CR #816 at 68–75.

But as was said at the beginning, much has changed since then. The Court of Appeals has vacated the portion of Chaofan's conviction covering the alleged RICO conspiracy to defraud the Bank of China. The Court of Appeals has also placed the foreign conduct of Chaofan and his codefendants' off limits. With those changes, it strains credulity to suggest that Chaofan should receive the same sentence that he did before.

The Guidelines suggest that a much lower sentence is appropriate. As demonstrated above, the appropriate sentence under the Guidelines is 30 to 37 months. That range is "the starting point and the initial benchmark," and it must "be kept in mind throughout the [sentencing] process." *Carty*, 520 F.3d at 991 (quoting *Kimbrough v. United States*, 128 S.Ct. 558, 574 (2007) and *Gall v. United States*, 128 S.Ct. 586, 596–97 n.6 (2007)) (internal quotation marks omitted for readability). However, the Guidelines are only one factor to consider under § 3553(a), and are not binding. *Id.*

If this Court "decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (quoting *Gall*, 128 S.Ct. at 597. Moreover, the sentence in general, and a departure particularly,

should be sufficiently explained "to permit meaningful appellate review." *Id.* at 991–92.

Also relevant here is the fact that Chaofan has been in custody since October 2004. *See, e.g.*, *PSR* at 13. The 110 months his freedom has been restricted during that time represents the minimum sentence this Court can impose, not in law, but in fact.

Additionally, whatever sentence this Court imposes, it must be remembered that it in no way eliminates Chaofan's risk of prosecution and incarceration in China (or anywhere else he may have violated the law).

In light of all the changed circumstances brought about by the decision of the Court of Appeals, the appropriate sentence under § 3553(a) is time served, or 110 months.

This sentence "reflect[s] the seriousness of the offense[s]." 18 U.S.C. § 3553(a)(2)(A). As it stands, Chaofan's immigration and money laundering convictions are in the heartland of those respective crimes; there is nothing exceptionally noteworthy about the relevant domestic conduct. The mean sentences imposed for immigration and money laundering crimes in fiscal year 2012 are 16 and 33 months, respectively. U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* tbl. 13 (2012).[9] A sentence of 110 months is well above those numbers, and thus certainly reflects the seriousness of the offenses.

A higher sentence would not "promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). In fact, imposing a more severe sentence than the one Chaofan has already served could promote *disrespect* for the law by promoting the belief that

---

[9] The numbers are more or less identical for the fiscal year 2009, when Chaofan was sentenced. For that year, the mean sentences were 32.9 months for money laundering and 17.4 for immigration crimes. U.S. Sentencing Comm'n, *Sourcebook of Federal Sentencing Statistics* tbl. 13 (2009)

defendants are sentenced more for what they are accused of than what they are convicted of. If Chaofan's sentence depends more on factors other than those related to his conviction, it will appear that such sentencing factors are the "tail which wags the dog of the substantive offense." *See McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986).

Given the unique circumstances under which the crimes of conviction occurred, and the incredible unlikelihood that they could be repeated, a sentence of 110 months is more than sufficient "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

Another factor to be considered is "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). Technically this Court could sentence Chaofan to up to 65 years in prison for the crimes he was convicted of, if this Court imposed the maximum sentence for each violation and then imposed the sentences consecutively all to each other. *See, e.g.*, *PSR* at 20, 24. Yet, as was stated elsewhere in the memorandum, the penalties available for the money laundering crimes are much smaller. The maximum sentence for a conspiracy to violate 18 U.S.C. § 2314 is 5 years. *See* 18 U.S.C. §§ 371 & 2314. The maximum sentence for a conspiracy to violate 18 U.S.C. § 1957 is 10 years. *See* 18 U.S.C. §§ 1956(h) & 1957. Unless this Court decides to punish Chaofan's money laundering conduct through sentencing under the immigration crime statutes, the maximum sentence for the money laundering crimes is 15 years. The nine plus years is more than half that maximum and is weighty enough on its own.

That said, if the sentences for violations of § 1957 and § 2314 are imposed consecutively, it would raise a serious question of fairness. In this case, the two statutes aren't punishing different conduct. Because the Government can't prove any substantive violations of either statute, the related convictions cover the same

conspiracy. But even if you assume for the moment that the Government's narrative is correct, and that the 19 transactions it raised were substantive violations of those two statutes, there would still be overlap. Under the Government's narrative, essentially all the violations of one would also be a violation of the other. For that reason, whatever this Court concludes, imposing consecutive sentences for the money laundering conspiracies is not appropriate.

Finally, a few words must be said about the Government's argument for why this Court should vary Chaofan's sentence above the Guidelines recommendation. In summary, the Government argues that Chaofan's sentence should be varied upward because he moved to the United States to avoid punishment, engaged others in a complex fraud, tried to run away upon arrest. The Government also argues an upward variance is in order to avoid disparity with Zhen Dong Yu's sentence. *See Government's Resentencing Memo*, CR #855 at 23–26.

The easiest of these to address is the dubious notion that Chaofan should face a lengthier prison sentence for his panicked running upon being arrested. To support its argument, the Government cites *United State v. Truong*. In that case, the defendant led the police on a high-speed chase, causing the near death of a bystander in the process. *See* 587 F.3d 1049, 1051–52 (2009). That is a far cry from what happened here. Bolting, then immediately being restrained, does not represent the same risk or disregard for the safety of others as a high speed chase.

As to the allegation that Chaofan moved to the United States to avoid punishment for crimes in China and led a complex plot, no variance is warranted at all. The Government's support for this argument is the fact that Chaofan orchestrated an elaborate plot to move himself, his codefendants, and his money to the United States to keep all from the reach of the Chinese authorities. But what the Government's argument fails to acknowledge is that Chaofan's crimes of

39

conviction capture all of this conduct and punish it accordingly. The immigration RICO conspiracy, the other immigration crimes, and the money laundering conspiracies already impose the baseline. Essentially the Government wants to increase Chaofan's punishment for the same behavior that caused him to be subject to punishment to begin with. The Government offers no clear reasoning on how or why the Guidelines fail to account for the described behavior and punish accordingly. Its insistence that Chaofan be doubly punished for the same conduct should be ignored.

The Government's last argument for an upward variance depends on Zhendong's sentence of 12 years and his cooperation in this case. The Government reasons that Chaofan, being more culpable than Zhendong, should have a relative sentence that reflects that increased culpability. But this ignores the reality of the situation then versus now. When the Government offered Zhendong a sentence of 12 years, and when Zhendong accepted, both parties were operating under the assumption that the groups foreign conduct was properly before U.S. courts, both as a substantive offense and as relevant conduct at sentencing. But that assumption is wrong, as the Court of Appeals determined. Zhendong's sentence, even though it includes a significant reduction, is still based on the conduct that he should not have been punished for. To now tie Chaofan's sentence to Zhendong's would deny Chaofan the benefit of the victory he won at the Court of Appeals. In this instance, in light of the change of circumstances, a disparity with Zhendong's sentence should be welcomed, not avoided.

If there is a disparity to be avoided, it would be a disparity with the sentence this Court previously imposed. As this Court recalls, the sentence dictated by the Guidelines and pushed by the Government was a term of 65 years, the maximum sentence possible for the counts of Chaofan's conviction. Nevertheless, this Court

found that 25 years was a sufficient sentence in light of the size of the loss — over $450 million — and the magnitude of the conspiracy. *Sentencing Transcript, Day 2*, CR #816 at 68. But now, the most loss, or laundered money, in consideration is at most $20 million. With all other factors being the same, both logic and fairness dictate that the sentence must be much shorter this time.

Despite the disparity of imposing the same sentence now, the Government is requesting just that. The Government never explains why an upward variance is warranted on all but the worse facts from last time. Effectually the Government is attempting to circumvent the decision of the Court of Appeals through this Court's discretion under § 3553(a). A sentence under such conditions is untenable as well as unconscionable.

The same sentence as was previously imposed is certainly not warranted. Instead, this Court should impose a sentence of time served or 110 months. That sentence is sufficient under the § 3553(a) factors.

## IV.   <u>Restitution</u>

The Government has requested that Chaofan and his codefendants be ordered to pay restitution of $7,813,905.75 to the Bank of China, "based upon the amounts that defendants transferred into the United States as part of their fraud scheme." *Government's Resentencing Position re Restitution*, CR #856 at 1. The sum the Government requests is a combined total of all the gambling transactions in the United States. *Id.* at 9.

There are several issues with the Government's restitution request. Each is sufficient to prevent a restitution order. Combined together, they make a restitution order to the Bank of China impossible.

## A.     The Bank of China is not a "victim" under the restitution statutes

In order to receive restitution under the relevant restitution statutes, a person or entity must be a "victim." Both restitution statutes define a victim as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *See* 18 U.S.C. §§ 3663(a)(2) & 3663A(a)(2).

Chaofan was convicted of several immigration crimes, including a RICO conspiracy to commit those same crimes. Chaofan was also convicted of conspiracies to violate 18 U.S.C. §§ 1957 and 2314, both money laundering crimes. To be a victim under the restitution statutes, the Bank of China must have been directly and proximately harmed as a result of one of those offenses, or, in the case of the conspiracies, directly harmed by criminal conduct in the course of the conspiracy. There is no question that the immigration crimes in this case are irrelevant in answer the question whether the Bank of China is due restitution. If the Bank is a victim for restitution purposes, it must be in relation to the money laundering conspiracies.

According to the Government's theory of the case, Chaofan and his codefendants embezzled large sums of money from the Bank of China, *and then* conspired to launder some of that money into the United States. *See, e.g.*, *Government's Resentencing Position re Restitution*, CR #856 at 8. In other words, after the Bank of China had suffered its loss, the defendants conspired to use some of it in illegal transactions. Under this scenario, the Bank of China is not a victim. The money laundering conspiracies did not include any criminal conduct that

directly harmed the Bank because the harm was already done. Because the Bank is not a victim, no restitution order can be granted in its favor.

**B.    The casino transactions were not "criminal conduct"**

Even if the definition of conspiracy is stretched to the extreme to include conduct that preceded the conspiracy, restitution in favor of the Bank of China is still not warranted. Again, the restitution statutes limit victims to those "directly harmed by the defendant's *criminal* conduct in the course of the . . . conspiracy." *See* 18 U.S.C. §§ 3663(a)(2) & 3663A(a)(2) (emphasis added). The problem for the Government is that it cannot show that the casino transactions *are* criminal conduct.

For there to be a violation of either 18 U.S.C. §§ 1957 or 2314, the Government must show that the money involved in the transactions is traceable to a criminal act. *See, e.g.*, *Xu*, 706 F.3d at 980, 982. But as was discussed extensively above, the Government cannot do that. The Court of Appeals said as much, and that is the law of the case. *See id.* at 992, 994; *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (law of the case doctrine) Moreover, as already demonstrated, at most only three checks involved in these gambling transactions can be traced to Ever Joint, and none of them can be traced to criminal activity. In fact, many of the check aren't even attributable to Chaofan or his codefendants. Because tracing is impossible as a matter of law and fact, the Government cannot show that these casino transactions are criminal conduct. Consequently, no restitution order may be based on those amounts.

## V.     CONCLUSION

Based on the proceeding arguments and facts, Chaofan Xu submits that a sentence of time served, 110 months, is appropriate. Further, no restitution is appropriate as the Government cannot meet its burden in support of it.

DATED:  December 20, 2013

Respectfully submitted,

 /s/ Mario D. Valencia
MARIO D. VALENCIA
*Counsel for Mr. Chaofan Xu*