MARIO D. VALENCIA
Nevada Bar No. 6154
1055 Whitney Ranch Dr., Ste. 220
Henderson, NV 89014
T. (702) 940-2222
F. (702) 940-2220
*Counsel for Defendant Chaofan Xu*

---

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEVADA

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>vs.<br><br>CHAOFAN XU, et al.<br><br>     Defendants. | No. 2:02-cr-00674-PMP-LRL<br><br>Defendant Chaofan Xu's REPLY to the GOVERNMENT'S REPLY to Xu's resentencing position |

Defendant Chaofan Xu, through his attorney of record, Mario D. Valencia, hereby files this reply to the government's reply to Xu's earlier sentencing position.


Dated: July 1, 2014

Respectfully Submitted,

                              /s/ Mario D. Valencia
                              MARIO D. VALENCIA
                              *Counsel for Mr. Chaofan Xu*

# TABLE OF CONTENTS

I.   Factual Issues ................................................................................. 1

   A.   Chaofan Xu amassed a substantial amount of wealth before 1990 ....... 1

   B.   Chaofan Xu had other sources of income beyond Ever Joint or the
        Bank of China ............................................................................. 3

   C.   A quick response to the government's reply regarding transactions 14,
        15, 16 and 17 .............................................................................. 5

II.  Sentencing Issues ............................................................................ 7

   A.   The government is trying to stretch the definition of "relevant conduct"
        beyond reason to reach irrelevant foreign conduct ................................ 7

   B.   The government alternatives to tracing have no basis in Ninth Circuit
        law ........................................................................................... 10

   C.   The necessity of detailed factual findings ............................................. 14

   D.   The abuse of trust enhancement is inconsistent with the Ninth's
        decision ...................................................................................... 14

   E.   The government wants to punish Xu for overseas conduct, not the
        crimes of conviction ...................................................................... 15

III. Restitution..................................................................................... 15

IV.  CONCLUSION ............................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*United States v. Baker*, 227 F.3d 955 (7th Cir. 2000)..................................................10

*United States v. Davis*, 226 F.3d 346 (5th Cir. 2000)..................................................13

*United States v. Follet*, 269 F.3d 996 (9th Cir. 2001)..................................................16

*United States v. Gossi*, 608 F.3d 574 (9th Cir. 2010..................................................16

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)..................................................12

*United States v. Owens*, 159 F.3d 221 (6th Cir. 1998)..................................................10

*United States v. Reiss*, 186 F.3d 149 (2d Cir. 1999) ..................................................12

*United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997)..................................10, 11

*United States v. Xu*, 706 F.3d 965 (2013)..................................................9, 10, 16

## Statutes

18 U.S.C. § 1956..................................................10, 11, 12, 13

18 U.S.C. § 1957..................................................7, 9, 10, 11, 12, 13, 14, 15

18 U.S.C. § 2314..................................................7, 10

18 U.S.C. § 3553..................................................15

## U.S. Sentencing Guidelines

USSG § 1B1.3..................................................9

USSG § 2S1.1..................................................11

USSG § 3B1.3..................................................15

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   <u>Factual Issues</u>

A.   **Chaofan Xu amassed a substantial amount of wealth before 1990**

In his sentencing memo, Chaofan Xu points out that the testimony and evidence presented at trial show that he "had some substantial wealth available to him *before* 1990." CR 863 at 9-12.  Since the government doesn't have any evidence or testimony to disprove, or even contradict, this fact, they raise several irrelevant points in response.

For example, the government tries to discredit the evidence by pointing out that the Standard Chartered bank record created in 1996 mistakenly states Chaofan Xu "worked for the Bank of China (in the past tense) when in fact defendant Chaofan worked for the bank until October 2001." CR 870 at 13.  The UBS bank records from 1998 and 1999, on the other hand, correctly stated Chaofan "currently worked for the Bank of China." *Id*.

What difference does it make that the Standard Chartered bank document mistakenly states Chaofan Xu worked—past tense—at the Bank of China?  The important (relevant) thing is that both documents—the Standard Chartered Bank record from 1996 and the UBS bank records from 1998 and 1999—are consistent about the fact that Chaofan Xu amassed a substantial amount of wealth *before* 1990, with an estimated net worth over USD $30 million.  *See e.g.*, CR 863 at 10.  On this point, there is no contradiction in the documents, and the government has not provided, or cited to, any evidence to contradict this fact.

The government also tries to discredit the testimony and evidence that Chaofan Xu had amassed a substantial amount of wealth *before* 1990 by pointing out that, "although the two customer memoranda referred to investments in the late

1980s, Ever Joint in fact was incorporated in late 1991 and Ever Joint's real estate activity would have occurred after that date." CR 870 at 13. But that's the point, contrary to the government's theme that Chaofan Xu's only source of income (and thus only source of money from which to gamble in the United States) was money stolen from the Bank of China and transferred to Ever Joint, the testimony and evidence at trial show that Chaofan Xu had amassed a substantial amount of wealth in the late 1980s *before* Ever Joint was incorporated in 1991, and thus had money (lots of it) separate and apart from Ever Joint with which to travel and gamble and invest.[1]  *See* CR 863 at 9-12.

Lastly, the government concludes that, since Chaofan Xu was convicted on all counts, the jury credited Morris [the government's financial expert] and rejected

---

[1] The government writes in its reply sentencing memorandum, "Initially, Borelli admitted that defendant Chaofan's money came from Ever Joint. (RT [8/20/08 p.m.] 239)." CR 870 at 13:2-3. The clear implication of this sentence is that initially Borelli admitted *the only source or all* of Chaofan's money came from Ever Joint. That's absolutely false. Here are the direct quotes from the trial testimony cited by the government:

> Q.   And you would agree that in Xu Chaofan's personal accounts money came in from Ever Joint Properties.
>
> A.   Yes.
>
> Q.   And similarly in Xu Guojun's accounts money came in from Ever Joint Properties.
>
> A.   That's right.

RT (8/20/08 p.m.) 239:17-22.

At no time does Borrelli admit that *all* of Chaofan's money came from Ever Joint, or that Ever Joint was the only source of income Chaofan had. Borelli simply agreed that in Chaofan's personal accounts there was money that came from Ever Joint. That's not even in dispute.

2

Borrelli [the defendants' expert].  CR 870 at 12.  The government's conclusion is based on at least one false premise.

First, the fact that Chaofan Xu had amassed a substantial amount of wealth *before* 1990 was established by bank records from two separate banks, Standard Chartered bank and UBS bank, not by Borelli's testimony.  He simply testified about what the bank records said, and did so truthfully (*e.g.*, the government relies on Borelli's testimony to point out that the Standard Chartered bank records from 1996 mistakenly said Chaofan Xu worked, in the past tense, at Bank of China).

Second, the jury did not have to disbelieve the bank records and Borelli's testimony about the bank records, showing Chaofan Xu was a very wealthy man *before* 1990, to convict him and the other codefendants of violating the United States' immigration laws or conspiring to launder or transfer money the jury believed defendants stole from the Bank of China.  One does not have to be poor to engage in this type of illegal activity.

In short, the testimony and evidence at trial show that Chaofan Xu had amassed a substantial amount of wealth *before* 1990—*before* Ever Joint was established and *before* the alleged conspiracy in this case began—with which he could travel, gamble, and invest.

## B.   Chaofan Xu had other sources of income beyond Ever Joint or the Bank of China

In his sentencing memorandum, Chaofan Xu pointed out how the evidence and testimony presented at trial showed that he had other sources of income beyond Ever Joint and the Bank of China.  *See* CR 863 at 12-14.  These other sources of income included Yau Hip Trading Company (Yau Hip) and "97 or 98 companies, depending on whether you include EJP [Ever Joint Properties] that Chaofan was

involved with. The government's financial experts, however, were instructed to look into only seven of these companies. " CR 863 at 14 (quotations and record citations omitted).

In its reply sentencing memorandum, the government does not address the 97 or 98 other companies Chaofan Xu was involved with.

The government only addresses Yau Hip.  Since they have no evidence to contradict the fact that Yau Hip, a trading company in Hong Kong, engaged in legitimate business dealings, like trading plant equipment, motor vehicles, and raw materials —— the raw materials were imported from Japan and Taiwan, the equipment was imported from Switzerland (see CR 863 at 13) —— the government writes about "the absence of any real economic relationship between Kaiping Polyester Factory and Ever Joint."  CR 870 at 14.  They talk about how Kaiping Polyester was the purported borrower of $95 million of false loans that were diverted to Ever Joint, and about the transfer of funds between Ever Joint, Kaiping Polyester, and Zhong Hui Filament Company (a subsidiary of Kaiping Polyester), and how there was no commercial documentation to show a commercial basis for these transfers. Id. But the same cannot be said, or more importantly established, about Yau Hip.[2]

_____

[2] The government cites to one instance where Yau Hip transferred HKD 875 million to Ever Joint, but they do not cite to any evidence or testimony to show the HKD 875 million was from fraudulent loans or from money taken from the Bank of China rather than from Yau Hip's legitimate business dealings, and then Ever Joint transferred HKD 432 million back into Yau Hip.  CR 870 at 14.  In other words, Yau Hip lost about half of what it transferred out. This loss clearly would not count towards the $22 million in profit Yau Hip made from 1993 to 2000 that was another possible source of income or money Chaofan Xu had available to him, as a 90% owner of Yau Hip. CR 863 at 12-14.

4

Since the government doesn't have any evidence to prove Yau Hip was not engaged in legitimate business dealings, and that the $22 million it made in profits from 1993 to 2000 were from legitimate business dealings, the government argues that Yau Hip was only "a possible source of income" for Chaofan Xu, according to Borelli. CR 870 at 15. That's the point, however, Chaofan Xu is making. The fact is that Chaofan Xu had other possible sources of income—the substantial amount of wealth he accumulated in the 1980s, Yau Hip, and 97 or 98 other companies he was involved with—contrary to the government's theme throughout this case: that Chaofan Xu's only source of income was Ever Joint and the money from Bank of China.

**C.    A quick response to the government's reply regarding transactions 14, 15, 16 and 17**

In his sentencing memorandum, Chaofan Xu addressed in specific detail where the money involved in transactions 14, 15, 16 and 17 came from, and how the government's own financial expert did not, and could not, trace the money used in these transactions to Ever Joint or the Bank of China. *See* CR 863 at 29-31.

In its reply sentencing memorandum, the government incorrectly states about these four transactions that Chaofan claims the money involved "cannot be traced *entirely* to Ever Joint or the Bank of China." CR 870 at 28 (emphasis added). Chaofan's argument is not that the government cannot *entirely* trace the money involved in these transactions to Ever Joint or the Bank of China. His argument is that the government cannot trace *any of the funds* involved in these transactions to Ever Joint or the Bank of China. It's not just an argument. It's a fact.

The government, in its reply sentencing memorandum, does not cite to any testimony or evidence to prove that the money involved in these four transactions came from Ever Joint or the Bank of China. Instead, they cite to Zhen Dong Yu's

5

deposition testimony where Zhen Dong Yu said "the money *he* sent from Hong Kong was connected to the embezzlement from the Bank of China. (RT [09/20/05] 121]." CR 870 at 28. That's not the money involved, however, in transactions 14, 15, 16 and 17. Zhen Dong Yu was testifying about his own money involved in transaction 13. *See* CR 863 at 28.

Since it cannot trace the money involved in these four transactions to Ever Joint or the Bank of China, the government writes, "Zhen Dong Yu also discussed with defendants Chaofan and Guojun how to deal with the money that they had in Hong Kong, which, *as was true with the money used for gambling*, was directly tied to Ever Joint (RT [02/25/08] 190), which in turn was funded substantially from the Bank of China fraud (RT [2/19/08] 29-32, 52-59, 61-62, 64-66)." CR 870 at 28-29 (emphasis added).

First, the government's statement is nothing more than a theory. Second, no part of the government's statement and citations to the record deals with the monies involved in these four transactions. Third, as Chaofan has pointed out in his sentencing memorandum, he had many other sources of wealth and income in Hong Kong (CR 863 at 9-14), and even if the government could trace the funds involved in these four transactions to Ever Joint or the Bank of China, which they cannot do and have not done, Ever Joint also made money from legitimate business dealings, so not every penny that came from Ever Joint was proceeds from illegal activity. *See* CR 863 at 14-17; *see also* CR 870 at 28-29 (government writes Ever Joint was *substantially* funded from the Bank of China fraud, but not *entirely*).

Lastly, the government's claim that "the money used for gambling, was directly tied to Ever Joint" is simply false. CR 870 at 28. Zhen Dong Yu didn't even testify the money came directly from Ever Joint. *See* (RT [02/25/08] at 189-90) (Zhen Dong Yu "heard" the money was "raised" by Chaofan and came from either Ever

Joint or his account). Moreover, in his first deposition, Zhen Dong Yu testified that the money taken from the Bank of China was transferred to "Hong Kong. Ever Joint Property Company." (RT [9/20/05] 116-117). He was then asked:

> Q.  And the money that you spent in the United States, either living or *gambling*, did that money come from this money that you've just described?
>
> A.  No.

(RT [9/20/05] at 117) (emphasis added).

Chaofan Xu will address the other transactions, and the evidence and testimony regarding those transactions, at the sentencing hearing.

## II.    <u>Sentencing Issues</u>

### A.    **The government is trying to stretch the definition of "relevant conduct" beyond reason to reach irrelevant foreign conduct**

The government begins section two of its response by stating that the Ninth Circuit's decision and the Sentencing Guidelines "permit consideration of transactions involving transport of criminally derived property into the United States." *Government's Reply (Doc. 870)* at 2.[3] Superficially, there is no disagreement on this point. If the government can show that criminally-derived property was transported into the United States in violation of 18 U.S.C. §§ 1957 or 2314, it would be proper for this Court to consider it. The problem, as Xu emphasized in his sentencing memo, is that the government *cannot* show that any criminally-derived property was transported into the country. The government was able to prove a

---

[3] The quotation has been converted to normal sentence case because TEXT IN ALL CAPS IS DIFFICULT TO READ. *See, e.g.*, *New Republic*, "Using all-caps is the worst form of emphasis," *available at* http://www.newrepublic.com/article/113578/using-all-caps-worst-form-emphasis

conspiracy to a jury. But now, like then, the government is unable to show that any funds that actually reached the shores of the United States are derived from criminal activity.

To the extent, however, that the government implies that foreign conduct is relevant conduct, that claim is without basis.

First, contrary to the government's assertions, the Ninth Circuit *did* invalidate Xu's RICO conviction to the extent it was based on foreign conduct. A plain reading of the higher court's opinion makes that obvious:

> The second superseding indictment describes two parts of the [RICO] enterprise . . . . One part consisted of racketeering activities conducted predominantly in China, and one part consisted of racketeering activities in the United States. . . .

> The first part centers on the Bank of China fraud and, to the extent it was predicated on extraterritorial activity, *it is beyond the reach of RICO* even if the bank fraud resulted in some of the money reaching the United States. . . .

> The second part, however, bound the Defendants' enterprise to the territorial United States. This second part involved racketeering activities conducted within the United States including the commission of RICO predicate crimes based on violations of United States immigration laws . . . .

> In sum, Defendants' violations of United States *immigration laws* fall squarely within RICO's definition of racketeering activity. . . .

> We affirm Defendants' count one convictions because the convictions are not based on an improper extraterritorial application of RICO, but rather are *based on a pattern of racketeering activities* that were conducted by the Defendants *in the territorial United States.*

*United States v. Xu*, 706 F.3d 965, 978–79 (2013) (emphasis added). In short, Xu's RICO conviction only stands because the government charge included immigration predicates. Had those been missing, the RICO charge would have failed.

Second, the government implies that foreign conduct is relevant conduct because the Ninth Circuit upheld the money laundering conspiracy conviction. *Government's Response* at 3–4. "That charge was premised on the indictment's allegation of the specific unlawful activity of fraud against a foreign bank." *Id.* at 4. With that, the government conflates a conviction for conspiracy with a conviction on the substantive charge. Essentially the government is trying to having it both ways with the conspiracy charge: it need only prove the agreement, not an actual substantive violation, to get the conviction, but the conviction is *proof* of where money came from. That's just not the way it works.

Moreover, the government's argument ignores the nature of 18 U.S.C. § 1957 and the definition of relevant conduct. That section punishes the transfer of any criminally derived funds (as long as there is a legitimate connection to the United States). Meanwhile, for the purposes of this sentencing, relevant conduct is limited to acts and omissions committed during the commission of offense of conviction or in preparation for the offense of conviction. *See* USSG § 1B1.3(a)(1). In other words, relevant conduct for a violation of § 1957 is only the acts and omission committed to violate § 1957 or to prepare to violate it. The bank fraud obviously preceded any violation of § 1957. But to say that any bank fraud was committed to "prepare" to violate § 1957 just doesn't make any sense—no one steals money just so they can launder it.

In sum, the Ninth Circuit's validation of the money laundering conspiracy conviction doesn't pull foreign conduct into consideration.

9

**B.    The government alternatives to tracing have no basis in Ninth Circuit law**

As the Ninth Circuit panel recognized, the government cannot prove any actual violations of § 1957 or § 2314. *See Xu*, 706 F.3d at 980 ("The government concedes that they are unable to trace the proceeds of the Bank of China fraud directly to the money brought into the United States."); *id.* at 992 ("[T]he government was unable to establish the tracing of funds necessary to establish guilt on those underlying offenses."). In light of this fatal weakness, the government seeks to lower its burden to only proving easier details. The government offers two different ways in which it can shirk its duty of proving criminal culpability.

The one that is most effortlessly disregarded is commingling. Instead of tracing the money in the U.S. transactions to show the extent to which the defendants violated § 1957, the government wants only to show that money involved with the U.S. transactions may have been *commingled* with dirty money. *Government's Response* at 7–8. The government supports this theory of culpability with two cases that are readily distinguished. Each cases involves a violation 18 U.S.C. § 1956, and not 18 U.S.C. § 1957 exclusively. *See United States v. Owens*, 159 F.3d 221, 224 (6th Cir. 1998); *United States v. Baker*, 227 F.3d 955, 959 (7th Cir. 2000). But as the Ninth Circuit long ago explained, there are critical differences between the two statutes, making case law interpreting the one unhelpful in interpreting the other. *See United States v. Rutgard*, 116 F.3d 1270, 1290–92 (9th Cir. 1997). This small quote emphasizes the point:

> If § 1956 required tracing of specific funds, it could be wholly
> frustrated by commingling. For that reason, the statute not
> only proscribes any transaction whose purpose is to hide
> criminal funds but reaches any funds "involved" in the
> transaction. Neither the same reasoning nor the same
> language is present in § 1957, the statute here applied.

10

*Id.* at 1292.

But any deep analysis of these cases is really unnecessary to show that commingling is an untenable theory. To discard the theory, one need only open the relevant Sentencing Guidelines section. Application Note 3(B) to USSG § 2S1.1 addresses when commingling is a relevant consideration. Relevant to the alleged § 1957 violations here, the application note states that if a monetary transaction "*results in* the commingling" of legitimate funds with criminally-derived funds, and the defendant cannot provide sufficient information to distinguish the two, the resulting sum is considered the amount laundered. USSG § 2S1.1 app. n.3(B) (emphasis added). For example, if a defendant take some dirty cash, then deposits it with clean, he is sentenced for the whole sum, unless he can show how much of the deposited money was dirty. The wisdom of this approach is debatable, but that is the application note's instruction.

The government, however, wants to take it beyond that. It claims that it is enough to show that money may have come from a commingled source, and that it need not show that dirty money was involved at all. This approach drops the critical "results in" language right out of the application note. The appeal of this approach is obvious. Instead of having to prove substantive violations of § 1957, the government need only prove that some transactions occurred, and that there is some dirty money somewhere. That is not what the application note allows and that is not consistent with the statute at issue. The government's commingling theory must be rejected.

The second and slightly more elaborate theory that the government offers is that strict tracing is not required, just sufficient other evidence that the money is criminally derived. *See Government's Response* at 6–7. The government doesn't really explain how it works and instead just offers a brief quotation from one Second

11

Circuit case, so more explanation of what that case stands for is necessary before its irrelevance can be shown.

In *United States v. Reiss*, the defendant pleaded guilty to conspiring to violate § 1957 under § 1956(h). 186 F.3d 149, 151 (2d Cir. 1999). The defendant Reiss had transactions into and out of his accounts that added up to more than $16 million, but for sentencing purposes, the district court found that only three transactions that together summed $3.15 million represented laundered funds. *Id.* Reiss only challenged the court's finding that part of that sum, $2.4 million, was criminally derived. *Id.* at 151–52.

When the Second Circuit examined the details surrounding the $2.4 million, it did not fault the district court's finding. As the opinion relates, the $2.4 million was transferred from at least six bank accounts in three countries, in twelve separate wire transfers, through shell companies and fronts set up either by and for the defendant Reiss, to an escrow fund used to purchase an airplane in Columbia. *Id.* at 152–53. Reiss and his associates used subterfuges to hide details of the transaction, and a known Colombian narcotics trafficker was involved with the deal. *Id.* The Second Circuit said *all* these details supported the district court's finding that this money was derived from criminal proceeds. *Id.* at 152 ("Reiss' scheme concerning the airplane purchase required many convoluted steps, a ruse that is characteristic of similar dealings with drug traffickers.").

In a later case, the Second Circuit expressed the principle on display in *Reiss*: "Under our Circuit's precedent, the government is required to link the moneys in question to specified unlawful activities, but this link can be made through circumstantial evidence." *United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) (citing *Reiss*). The question now is if and how this principle is applicable to this case.

12

On the question of whether this *Reiss*-type analysis is applicable, the answer is no. The Second Circuit, like a few other circuits, appears to have taken a different approach to § 1957 than the Ninth Circuit has. In several circuits, strict tracing to show a violation of § 1957 is *not* required. *See, e.g, United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000) (noting different approaches, including the Ninth's *Rutgard*). So far, it appears there is no Second Circuit case that answers what path that court has taken. However, when the *Gotti* case summarized the *Reiss* holding, it did so in the context of analyzing the sufficiency of the evidence supporting a conviction, albeit a violation of § 1956 directly. *See* 459 F.3d at 334. That indicates that the Second Circuit considers the *Reiss* principle to be a general rule, not just one applicable at sentencing. The fact that it would excuse strict tracing places it in direct conflict with the Ninth's Circuit's *Rutgard*. Simply put, the Second Circuit's *Reiss* expresses a lower, different standard of proof for violations of § 1957 and must be rejected here.

However, assuming that the *Reiss* precedent was appropriate in the Ninth Circuit, the question of how it would apply still remains. As *Gotti* states, a definite link to criminal proceeds is still required. However, under *Reiss/Gotti*, the government may substitute circumstantial evidence for strict tracing. *See Gotti*, 459 F.3d at 337.

But even under *Reiss*, the government has failed to establish a link to criminal proceeds. As Xu's main sentencing memo explained, beyond showing their existence, the government can provide little information about the U.S. transactions, let alone link them to criminal proceeds through circumstantial evidence. When this poverty of detail is contrasted with the wealth of information painting the transaction in *Reiss* as corrupt, it shows how misplaced the government's reliance on *Reiss* is. So even if *Reiss* is accepted as valid, the

13

government still can't prove that the U.S. transactions should be used to increase Xu's offense level.

## C.     The necessity of detailed factual findings

Much of the government's response is devoted to asserting the tainted nature of the funds. *See Government's Response* at 11–31. That is expected, as it is the government's burden to prove, by at least a preponderance of the evidence, that the transfers were in violation of the law. The complicated factual details involved also raise another important point: because of the contention on the issue, detailed factual findings are necessary so that this Court's decision, whatever it ultimately is, may prove adequate for review on appeal.

## D.     The abuse of trust enhancement is inconsistent with the Ninth's decision

The government defends the imposition of the abuse of trust enhancement on two grounds. The first is that the Ninth Circuit rejected a previous challenge to the enhancement, the second is that the Ninth Circuit ruled that foreign conduct was relevant to sentencing. *Government's Response* at 31–32.

Neither argument holds up. While the Ninth Circuit rejected a challenge to the enhancement, it did so because it rejected a different argument: that Xu was not in a position of trust vis-à-vis the United States. That is the extent of the Ninth's mandate on the issue. Second, while the Ninth Circuit did not categorically exclude all foreign conduct from consideration in its decision, the effect of its decision makes it practically so.

As expressed already above, the Ninth Circuit drastically limited the breadth of the RICO conviction by limiting it to the immigration matters. Moreover, the conspiracies to violate 18 U.S.C. §§ 1957 and 2314 do not hinge on Xu's position as bank manager. For sentencing purposes, Xu's former occupation is no longer

14

relevant conduct under USSG § 3B1.3. The government does not rebut this. For this reason, the enhancement must fail.

**E.     The government wants to punish Xu for overseas conduct, not the crimes of conviction**

In the government's response, it argues in various ways that Xu's assessment of the 18 U.S.C. § 3553 factors is out of line. Insomuch as Xu's original assessment stands firm, the government's weak arguments will not be addressed.

However, to the extent that the government argues that Xu is underemphasizing the seriousness of his offense and that a sentence consistent with his Guideline's calculations would "suggest that the United States represents a safe haven for those who commit crimes overseas," a short response is due. *See Government Response* at 32–33.

The problem with the government's position is that the crimes for which Xu stands convicted, the violations of U.S. law upheld on appeal, are relatively minor. Xu's actions abroad are not at issue now, except tangentially. And far from being a safe haven, the United States has shown itself willing to prosecute those who come here and break laws in the process. But simply fleeing another country is not a crime. The government may find itself frustrated that Xu is not punished to the degree it feels appropriate, but U.S. law just does not reach any of the crimes allegedly committed in China. Any punishment Xu receives should be for the crimes of conviction, not for supposed violations abroad.

## III.   <u>Restitution</u>

In his sentencing memo, Xu explained that restitution to the Bank of China was inappropriate because the Bank is not a victim under the restitution statutes

nor are the casino transactions criminal conduct that harmed the Bank. The restitution statutes were carefully examined and applied to the facts of this case.

In response, the government offers no analysis of the statutes. *See Government's Response* at 34. It offers no explanation of their application here. It doesn't even cite the statutes, or even acknowledge their existence. Instead, it only points to its sentencing analysis and says that it is sufficient to show that restitution is warranted under the law.

As this Court is well aware, the restitution statutes are an entirely different creature than the sentencing statutes and the Guidelines. Indeed, the Ninth Circuit reversed this Court's previous restitution order in part because it relied on "Guidelines calculations in making factual findings regarding the amount of actual loss suffered by the Bank of China." *Xu*, 706 F.3d at 994.

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Gossi*, 608 F.3d 574, 577 (9th Cir. 2010) (quoting *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001)). As Xu's sentencing memo made clear, the statutory authority does not provide for restitution in this case. Practically that may be a difficult result to accept, but that is simply the result of the government's decision to prosecute crimes only tangentially connected to this country. Because the government has failed in its burden to show that restitution should be imposed, this Court should not impose any restitution order at sentencing.

## IV.   CONCLUSION

Based on the preceding arguments and facts, Chaofan Xu submits that a sentence of time served, 110 months, is appropriate. Further, no restitution is

appropriate as the Government cannot meet its burden in support of it.

DATED:  July 1, 2014

Respectfully submitted,

 /s/ Mario D. Valencia
MARIO D. VALENCIA
*Counsel for Mr. Chaofan Xu*

17